Osvaldo SANTANA, Petitioner,

v.

Robert H. KUHLMANN Respondent.

No. 97 CIV. 3882RMBGWG.

United States District Court,
S.D. New York.

Nov. 13, 2002.

Mr. Osvaldo Santana, Green Haven Correctional Facility, Stormville.

John Veiga, Esq., Assistant District Attorney, New York County District Attorney's Office, New York.

### *ORDER*

BERMAN, District Judge.

### I. Background

On April 15, 1997, Osvaldo Santana ("Petitioner" or "Santana"), proceeding *pro se*, filed a petition for a writ of habeas corpus, pursuant to 28 U.S.C. § 2254 ("Petition"), challenging his April 21, 1999 convictions in the New York State Supreme Court, New York County, for, among other things, Murder in the Second Degree (New York Penal Law § 125.25[3]), Attempted Robbery in the First Degree (New York Penal Law §§ 110/160.15[1]),

and Criminal Possession of a Weapon in the Second Degree (New York Penal Law §§ 265.03). Santana was sentenced to an aggregate term of 39 years to life in prison. Petitioner contends that the trial court (i) lacked sufficient evidence to convict Petitioner of felony murder, *see* Petition, ¶ A; and (ii) deprived Santana of equal protection and due process of law by incorrectly applying N.Y. Penal Law § 125.25[3], *see* Petition, ¶ B.[1]

On April 17, 1998, U.S. District Court Judge Denny Chin dismissed Santana's Petition as time-barred under the Antiterrorism and Effective Death Penalty Act ("AEDPA"), 28 U.S.C. § 2244. "In the absence of any compelling explanation for the lengthy delay, 358 days does not constitute a 'reasonable time' within the meaning of the AEDPA particularly where, as here, the grounds for the petition are nearly identical to those raised on direct appeal." Memorandum Decision, dated April 17, 1998. On September 25, 1998, the U.S. Court of Appeals for the Second Circuit vacated the district court's dismissal of the Petition as time barred under 28 U.S.C. § 2244(d)(1) determining that Santana's claim fell within the limitations period. *See* Mandate of the United States Court of Appeals for the Second Circuit, September 25, 1998.

On September 25, 2001, Magistrate Judge Gabriel W. Gorenstein, to whom the matter had been referred, issued a Report and Recommendation ("Report") recommending that Santana's Petition be denied on the merits. Magistrate Judge Gorenstein found, among other things, that there was sufficient evidence in the record to support Petitioner's felony murder convic-

tion. Report at 20. "Santana actively participated in a gunpoint robbery. He viciously attacked Detective Mendez. Both he and Hernandez struggled with Detective Mendez while he had a gun and after Detective Mendez identified himself as a police officer...Given these events, it was forseeable that a gun battle would have been provoked and that someone would be struck by a bullet from that gun battle and die as a result." *Id.* Magistrate Judge Gorenstein also found that Petitioner's second contention should also be rejected for procedural reasons and as having no merit. *See id.* at 23. "Santana has offered no explanation for his failure to raise this claim in State court." *Id.* In any event, because Santana's due process and equal protection claims assert that the Court of Appeals misconstrued the causation requirement of New York Penal Law § 125[3], these claims fail on the merits. *Id.*

Petitioner filed objections to the Report on November 30, 2001 ("Petitioner's Objections"). The Respondent filed an Affirmation in Response to Petitioner's Objections on December 7, 2001 ("Respondent's Affirmation").

**For the reasons set forth below, the Court adopts the Magistrate's Report in its entirety.**

## II. Standard of Review

▆▆▆ A district judge evaluating a magistrate judge's report may adopt those portions of the report to which no "specific, written objection" is made, as long as those portions are not clearly erroneous. Fed.R.Civ.P. 72(b); *Thomas v. Arn,* 474 U.S. 140, 149, 106 S.Ct. 466, 88 L.Ed.2d

---

1. NY Penal Law § 125.25[3] defines felony murder as: "Acting either alone or with one or more other persons, he commits or attempts to commit robbery, burglary, kidnapping, arson...and in the course of an in furtherance of such crime or of immediate flight therefrom, he, or another participant, if there be any, causes the death of a person other than one of the participants..." N.Y. PENAL LAW § 125.25[3] (McKinney 1997).

435 (1985). Where timely objections are made, the district judge must make a *de novo* determination as to the objected to issues, but is not required to conduct a *de novo* hearing. *See Cespedes v. Coughlin,* 956 F.Supp. 454, 463 (S.D.N.Y.1997); *East River Sav. Bank v. Secretary of Hous. and Urban Dev.,* 702 F.Supp. 448, 453 (S.D.N.Y.1988). Thereafter, a district judge may accept, reject or modify, in whole or in part, the findings and recommendations of a magistrate judge. *See DeLuca v. Lord,* 858 F.Supp. 1330, 1345 (S.D.N.Y.1994); *Walker v. Hood,* 679 F.Supp. 372, 374 (S.D.N.Y.1988). The court will "read [the *pro se* party's] supporting papers liberally, and ... interpret them to raise the strongest arguments that they suggest." *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994).

## III. Analysis

The facts set forth in the Report are incorporated herein by reference.

The Court has conducted a *de novo* review of the record herein, as well as the Report, the Petitioner's Objections, the Respondent's Affirmation, and applicable legal authorities, and finds that the Report is not clearly erroneous, is in conformity with the law, and is supported by the record.[2]

### Petitioner's Objections

Petitioner contends that the evidence was insufficient to support a conviction for felony murder, stating that "neither the defendant nor his co-defendant fired the gun that killed the police officer. Nor did the defendant or his co-defendant have any knowledge that outside the building where the underlying robbery took place were numerous police officers waiting for one of them to exit the building." Petitioner's

Objections at 3. Magistrate Judge Gorenstein correctly observed that "it was foreseeable that a gun battle would have been provoked and that someone would be struck by a bullet and die as a result." Report at 20. He cited *People v. Kibbe,* 35 N.Y.2d 407, 362 N.Y.S.2d 848, 321 N.E.2d 773 (1974), where the court similarly found that the defendant's actions forseeably could have been a direct cause of the victim's death. 35 N.Y.2d at 412, 362 N.Y.S.2d 848, 321 N.E.2d 773 (emphasis omitted).

Petitioner's Objections also assert that the Court should not allow "itself to decide an issue based on an emotional response," presumably because the victim was a police officer. Petitioner's Objections at 7. There is no basis in law or fact to support that concern.

## IV. Certificate of Appealability

■ Petitioner has not made a substantial showing of the denial of a constitutional right and a certificate of appealability, therefore, should not issue. *See* 28 U.S.C. § 2253; *see also Slack v. McDaniel,* 529 U.S. 473, 483–84, 120 S.Ct. 1595, 146 L.Ed.2d 542 (2000) (holding that "[t]o obtain a COA [certificate of appealability] under § 2253(c), a habeas prisoner must make a substantial showing of the denial of a constitutional right...") To show the denial of a Constitutional right, a petitioner "must demonstrate that the issues are debatable among jurists of reason; that a court could resolve the issues [in a different manner]; or that the questions are 'adequate to deserve encouragement to proceed further.'" *Gordon v. Willis,* 516 F.Supp. 911, 913 (N.D.Ga.1980) (quoting *United States ex. rel. Jones v. Richmond,* 245 F.2d 234 (2d Cir.1957)), *cert. denied,* 355 U.S. 846, 78 S.Ct. 71, 2 L.Ed.2d 56

---

**2.** Any arguments presented by Petitioner in his Objections, but not specifically addressed

in this order, were considered by the Court and rejected.

(1957). The Court certifies pursuant to 28 U.S.C. § 1915(a)(3) that any appeal from this order would not be taken in good faith. See *Coppedge v. United States,* 369 U.S. 438, 82 S.Ct. 917, 8 L.Ed.2d 21 (1962).

## IV. Conclusion

For the reasons set forth above and in the Report, the Court adopts the Report in its entirety. Accordingly, the Court dismisses the instant Petition for a writ of habeas corpus and denies issuance of a certificate of appealability.

## REPORT AND RECOMMENDATION

GORENSTEIN, United States Magistrate Judge.

*Background*

This case is a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. The petitioner, Osvaldo Santana, is currently an inmate at Green Haven Correctional Facility. On April 21, 1991, Santana was convicted of Murder in the Second Degree (New York Penal Law § 125.25[3]), Attempted Murder in the Second Degree (New York Penal Law §§ 110/125/25[1]), Attempted Robbery in the First and Second Degrees (New York Penal Law §§ 110/160.15[1], [2][a], [4]), Criminal Use of a Firearm in the First Degree (New York Penal Law § 265.09[2]) and Criminal Possession of a

Weapon in the Second and Third Degrees (New York Penal Law §§ 265.03, 265.02[4]). He was sentenced to an aggregate term of 39 years to life in prison.

## I. PROCEDURAL HISTORY

### A. Evidence at Trial

In February 1990, the New York Police Department started an investigation of a suspected high-level cocaine dealer known as "Willie," later identified as Osvaldo Santana, and began negotiating a deal under which officers would purchase two kilograms of cocaine from him. (Tr.[1] Johnston: 1402–12, 1422–25; S. Br. 6–7; R. Br. 4–5). After extensive negotiations, Santana and Detective Joseph Mendez, who was working undercover, agreed to consummate the sale. (Tr. Johnston: 1428–31; S. Br. 8).

On March 5, 1990, Detective Mendez met with his backup team, put on a hidden transmitter, and prepared $47,000 in buy money, which he placed in a plastic shopping bag. (R. Br.5). New York State Trooper Joseph Aversa was one of the two officers assigned to stay as close as possible to Detective Mendez during the meeting with Santana. (S. Br. 8; R. Br. 5–6).

Detective Mendez picked up an informant who had worked on the deal and met Santana at about 3:00 p.m. near 201 Avenue A. (Tr. Johnston: 1437–38; S. Br. 8;

1. "Tr." refers to the trial transcript of *People v. Santana,* Indictment No. 2849/90, Supreme Court, New York County. The complete trial transcript has not been submitted as part of this petition. Pursuant to 28 U.S.C. § 2254(f), the Court requested the respondent to provide a complete transcript. The respondent furnished all pages except pages 1543–2470, which the respondent stated could not be located. *See* Letter from Assistant District Attorney Jon Veiga, dated April 29, 2001. Because the contents of the missing pages are not in dispute, the Court has relied on the references made to these pages in the briefs to

the Appellate Division or the New York Court of Appeals. *See Abreu v. Kuhlmann,* 2000 WL 1773476 at *2, n. 2 (S.D.N.Y. Dec.4, 2000).

"S. Br." refers to the Brief for Defendant–Appellant to the Court of Appeals, State of New York, dated April 12, 1993 (reproduced as Exhibit D to Respondent's Appendix in Support of Answer Opposing Petition for a Writ of Habeas Corpus). "R. Br." refers to the Brief for Respondent to the Court of Appeals, State of New York, dated August 6, 1993 (reproduced as Exhibit E to Respondent's Appendix in Support of Answer Opposing Petition for a Writ of Habeas Corpus).

R. Br. 6). Santana said he would transfer the drugs in his own apartment but did not want the informant involved because he did not want anybody else to know where he lived. (R. Br.6). The informant got out of the car and Santana got in. (Tr. Johnston: 1437–38, S. Br. 8–9; R. Br. 6). Santana directed Detective Mendez to 749 F.D.R. Drive, where they pulled up next to the courtyard outside. (S. Br. 9; R. Br. 7). Santana asked to see the money, so Detective Mendez got the bag out of the trunk and counted the money out for Santana. (Tr. Johnston: 1445–46). Then Detective Mendez put the money back in the trunk and returned to the front seat. (Tr. Johnston: 1446; S. Br. 9; R. Br. 7).

Once Santana saw the money, he said they should go inside "his apartment." (R. Br.7). The two men got out and headed toward the courtyard, which was surrounded by a fence and opened out into a grassy area. (Tr. Johnston: 1449; S. Br. 9; R. Br. 7). As they walked through it towards the back door, Detective Mendez suggested that they go to the front of the building. Santana refused, saying it was "easier just to run up" to the second floor. (R. Br.7). However, the rear entrance door had been boarded up and the hallway came to a dead end because the top of the stairs had been blocked by a padlocked plywood barrier. (Tr. Valentin: 2662–63; Lutz: 2651–54; R. Br. 8).

Trooper Aversa and Detective Frank Garrido had followed Detective Mendez and Santana into the courtyard. (S. Br. 9; R. Br. 8)). As Detective Mendez and Santana were about to enter the hallway, Santana noticed Trooper Aversa and said, "Oh wait." (R. Br.8). Detective Mendez reached for the door, said "Let's go up," and held the door open for Santana, who walked in. (R. Br.8). Detective Mendez followed. (R. Br.8).

Inside, the hallway was very dark because the bulbs had been removed from two working light fixtures. (S. Br. 9; R. Br. 8). With Santana leading the way, the two men walked to the end of the hallway and then made a right turn to a stairwell, which had a couple of steps to a landing. Santana suddenly stepped aside and told Detective Mendez to go first. Detective Mendez insisted that Santana continue to lead the way. (R. Br.9). However, at that point, co-defendant David Hernandez suddenly came from around the stairwell and placed a long-barreled silver revolver to the side of Detective Mendez's head. (S. Br. 9; R. Br. 9).

Hernandez jabbed at Detective Mendez's head with the revolver and backed Detective Mendez up against the wall. (R. Br.9). When Detective Mendez put his hands up, he felt the barrel of the gun. (*Id.*) He grabbed it, first with his left hand and then with his right, so that he had hold of the cylinder and also managed to get his fingers around the trigger guard. (S. Br. 9; R. Br. 9). Hernandez and Santana both began to struggle with Detective Mendez to try to get back control of the gun. (*Id.*) Detective Mendez kept trying to keep a grip on the gun, but Hernandez was trying to pull it away and Santana was punching Detective Mendez in the face, head, and hands, and kicking him in the legs. (R. Br.9). When Santana tried putting his hands over Detective Mendez's mouth and nose, Detective Mendez bit Santana's hand and Santana let go. (*Id.*) Santana returned to punching and kicking Detective Mendez, while Detective Mendez continued to hold on with both hands to Hernandez's gun. (*Id.*) Then, Santana grabbed Detective Mendez's hair, pulled his head back, and bit into the forehead. (S. Br. 9; R. Br. 10). The pain was so great that Detective Mendez's right hand lost its grip on the gun and Hernan-

dez finally managed to regain control of the gun. (R. Br.10).

Realizing that Hernandez had the gun, Mendez crouched down and yelled out, "I'm the police, I'm the police." (S. Br. 9–10; R. Br. 10). Hernandez pointed the gun right at Detective Mendez's face, turned to Santana, and said, in English, "I'm going to kill him now." (S. Br. 10; R. Br. 10). Detective Mendez grabbed at Santana and tried to get behind him. He managed to pull out his own gun from his waistband and point it at Hernandez as he "came up firing." (S. Br. 10; R. Br. 10). When Detective Mendez started shooting, Hernandez and Santana scattered. (R. Br.10). By the time Detective Mendez had fired four shots, Santana had run up the stairs and Hernandez had run out the door. (S. Br. 10; R. Br. 10–11)).

Trooper Aversa and Detective Moruzzi were in the courtyard when the shots rang out from the hallway. (S. Br. 10; R. Br. 11). Trooper Aversa drew his gun, crouched, and moved toward the door. (S. Br. 10; R. Br. 11). Detective Moruzzi drew his gun, started moving towards the building, and then turned to the surveillance team to wave for help. (S. Br. 10; R. Br. 11). Detective Moruzzi, who had been standing about ten feet away from Santana, was hit by a gunshot in his leg. (R. Br.11, 14). Hernandez started running towards Detective Moruzzi, still holding the long silver revolver, and pointing it at Detective Moruzzi's head. (S. Br. 11; R. Br. 11). Detective Moruzzi yelled, "police, halt," and pointed his gun at Hernandez, but Hernandez kept his gun pointed at Detective Moruzzi, and continued running in Detective Moruzzi's direction. Detective Moruzzi dropped into a combat posi-tion, and fired once at Hernandez. (S. Br. 11; R. Br. 11–12). When Hernandez still kept coming at him, Detective Moruzzi fired twice more. (R. Br.12). Hernandez still held his gun pointed at the officer and was still coming closer. Detective Moruzzi fired four more shots in rapid succession. Finally, Hernandez dropped the gun and fell over a fence into the grass. (S. Br. 11; R. Br. 12).[2]

Inside the building, Detective Mendez did not hear any gunfire outside, but yelled out, "It's me, it's Joe, I'm okay, I'm okay," before opening the door to go outside. (R. Br.12). Then, he pushed the door open and saw Trooper Aversa lying on the ground. (R. Br.12). Trooper Aversa's head was bleeding profusely. He had been shot under the right eye, leaving a hole about a half inch in diameter. (Tr. Pearl: 2626–28, 2630–38). He had died instantly. (Tr. Pearl: 2630, 2634).

Both Santana and Hernandez were arrested. (R. Br.13). Hernandez had received a critical wound to his stomach. (R. Br.14). Santana had been shot in his right toe. (Tr: Cruz 2996–2997). After waiving his rights, Santana later told police that he had gone to Apartment 9F at 749 F.D.R. Drive to visit his friend Raymond, who was not at home. (Tr. Donato: 3139–46). According to Santana, he got shot as he was leaving the building, but did not know who shot him. (Tr. Donato: 3147).

The ballistics testimony showed that Aversa's fatal wound was not caused by a lead bullet or partially jacketed lead bullet but rather by a full jacketed copper bullet. (Tr. Pearl 2632–33, 2641–42). The only gun recovered from the scene that contained such bullets belonged to Detective Moruzzi. (S.Br.13). Five of the shells

---

**2.** Moruzzi apparently did not testify that he had witnessed Hernandez fire a shot at him. *See* Brief for Defendant–Appellant to the New York Supreme Court, Appellate Division, First Department, dated March 1992, at 9; Brief for Respondent to the New York Supreme Court Appellate Division, First Department, dated September, 1992, at 15 n.*.

from Hernandez's gun were partially jacketed and one had aluminum jacketing. (S.Br.22).

The defense called four witnesses. (Tr. Baez: 3343–55; Jenkins: 3355–61; Rosario: 3361–71; Greene: 3371–75). Only one was present at the shooting, Ramon Baez. Baez testified that he saw the police take Santana out of the hallway and handcuff him. (Tr. Baez: 3347). He saw Hernandez exit the building and run toward an officer while pointing a gun at him. (Tr. 3350–52). He also saw Hernandez and the officers exchange fire. (Tr. Baez 3352). Hernandez did not lower the gun until he was shot and stumbled over a fence. (Tr. Baez 3352–53). Baez saw the police bring Santana out of the rear hallway, lay him on his stomach, and handcuff him from behind. (Tr. 3347).

### B. *Verdict and State Court Appeals*

On April 4, 1991, the jury convicted Santana of all the charges against him, except attempted murder and aggravated assault of a police officer (both of which related to officer Mendez). (Tr. 3919–22). On April 25, 1991, he was sentenced to an aggregate term of 39 years to life. *See* S. Br. 23.

Represented by counsel, Santana appealed to the Appellate Division, First Department. *See* Brief for Defendant–Appellant to the Appellate Division, First Department, dated March 1992 (reproduced as Exhibit A to Respondent's Appendix in Support of Answer Opposing Petition for a Writ of Habeas Corpus) (hereinafter, "Brief for Defendant–Appellant"). His brief alleged two grounds for appeal. The first ground was that the People's evidence was insufficient to convict Santana of felony murder and thereby deprived him of a fair trial. *See* Brief for Defendant–Appellant at 26–37. The second ground was that Santana's consecutive sentence for First Degree Criminal

Use of a Firearm should be modified to run concurrently with the sentence for Second Degree Attempted Murder because both crimes arose out of a single act. *See* Brief for Defendant–Appellant at 38–40.

The Appellate Division affirmed the judgment of conviction on October 22, 1992. *See People v. Hernandez*, 186 A.D.2d 471, 471, 588 N.Y.S.2d 567 (1st Dep't 1992). With respect to Santana's first ground for appeal, the Appellate Division held that the People had proved that "the defendants unquestionably 'forged' a critical link in the chain of events that led to Trooper Aversa's death," 186 A.D.2d at 473, 588 N.Y.S.2d 567, and that the "trial court properly charged the jury … that they could find the defendants guilty of felony murder of the officer's death if death would not have happened 'but for' the attempted robbery." *People v. Hernandez*, 186 A.D.2d at 473–74, 588 N.Y.S.2d 567. The Appellate Division determined that the New York felony murder statute required a showing that the defendant set "in motion the machinery which ultimately results in the victim's death." *People v. Hernandez*, 186 A.D.2d at 473, 588 N.Y.S.2d 567 (citation omitted). However, it was not necessary to show that the defendant was "the sole cause of death" but rather that the defendant's actions were "a sufficiently direct cause of the ensuing death." *Id.* (citation and emphasis omitted). With respect to the second ground for appeal, the Appellate Division held that the trial court "properly determined that the criminal events fell into three distinct groups such that the sentences could run consecutively to each other." *Id.* at 474, 588 N.Y.S.2d 567.

Santana was granted leave to appeal to the New York Court of Appeals on February 3, 1993. *See People v. Santana*, 81 N.Y.S.2d 847, 595 N.Y.S.2d 746, 611 N.E.2d 785 (1993). In that court, Santana argued

that the People's evidence was insufficient to convict him of felony murder and that the trial court's incorrect jury instruction deprived him of a fair trial. *See* S. Br. 25–43. The New York Court of Appeals affirmed the judgment of conviction holding "[t]he language of Penal Law § 125.25(3) evinces the Legislature's desire to extend liability broadly to those who commit serious crimes in ways that endanger the lives of others." *People v. Santana,* 82 N.Y.2d 309, 318, 604 N.Y.S.2d 524, 624 N.E.2d 661 (1993). The Court of Appeals stated that "there was no error in the court's instructions on defendant Santana's culpability" because "[t]he jury was properly charged that more than 'but for' causation was required; that it must find the fatal result was the sufficiently direct and foreseeable result of Hernandez's acts." *Id.* (citation omitted).

The Court of Appeals held that criminal liability is established when the defendant's action was a "sufficiently direct cause of the death," noting that "when the intervening acts of another party are supervening or unforeseeable, the necessary causal chain is broken, and there is no liability for the felons." 82 N.Y.2d at 317–18, 604 N.Y.S.2d 524, 624 N.E.2d 661 (citations omitted). Because there is evidence of "the Legislature's desire to extend liability broadly to those who commit serious crimes in ways that endanger the lives of others," *id.* at 318, 604 N.Y.S.2d 524, 624 N.E.2d 661, the court found that criminal liability could properly be extended to Santana for the death of Trooper Aversa.

Santana did not seek a writ of certiorari from the United States Supreme Court. He also did not mount a collateral attack on his conviction in State court.

### C. *Santana's Federal Habeas Corpus Petition*

Santana's *pro se* petition for writ of habeas corpus (hereinafter "Habeas Petition") is dated April 15, 1997, and was received by the Court on May 1, 1997. In the petition, Santana presents two claims: (1) that the People's evidence was insufficient to convict Santana of felony murder and the trial court's incorrect jury instruction deprived him of a fair trial, *see* Habeas Petition, ¶ A; and (2) that the state court deprived Santana of equal protection and due process of law by interpreting Penal Law § 125.25(3) to impose a heavier burden on Santana, *see* Habeas Petition, ¶ B. On April 17, 1998, District Judge Denny Chin issued a decision dismissing Santana's petition on the grounds that the petition was time-barred under the Antiterrorism and Effective Death Penalty Act ("AEDPA"), 28 U.S.C. § 2244, and Santana had not made a substantial showing of a denial of any constitutional right. *See* Memorandum Decision, dated April 17, 1998. Judgment was entered dismissing the petition on April 21, 1998.

Santana appealed to the United States Court of Appeals for the Second Circuit. On October 5, 1998, the Court of Appeals vacated and remanded the judgment of the District Court holding that Santana's application fell within the statute of limitations period.

Following briefing on the merits of the petition, an Order referring the petition for a Report and Recommendation issued on December 5, 2000. The petition was redesignated for decision by the undersigned on March 13, 2001.

### II. *APPLICABLE LEGAL PRINCIPLES*

Habeas corpus relief under 28 U.S.C. § 2254 is available to a petitioner in state custody in violation of the Constitution or a federal law or treaty. *See* 28 U.S.C. § 2254(a). "Before a federal court may

grant habeas relief to a state prisoner," however, "the prisoner must exhaust his remedies in state court." *O'Sullivan v. Boerckel*, 526 U.S. 838, 842, 119 S.Ct. 1728, 144 L.Ed.2d 1 (1999); *see* 28 U.S.C. § 2254(b)(1). "Because the exhaustion doctrine is designed to give the state courts a full and fair opportunity to resolve federal constitutional claims before those claims are presented to the federal courts, ... state prisoners must give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process." *O'Sullivan v. Boerckel*, 526 U.S. at 845, 119 S.Ct. 1728; *accord Daye v. Att'y Gen. of State of New York*, 696 F.2d 186, 190 (2d Cir.1982).

█ In order for a claim to be considered exhausted, it must have been presented fully and fairly in federal constitutional terms to the State courts. *See, e.g., Duncan v. Henry*, 513 U.S. 364, 365–66, 115 S.Ct. 887, 130 L.Ed.2d 865 (1995); *Picard v. Connor*, 404 U.S. 270, 275–76, 92 S.Ct. 509, 30 L.Ed.2d 438 (1971); *Morgan v. Jackson*, 869 F.2d 682, 684 (2d Cir.1989). Petitioners may "fairly present" their federal claims in state court by, *inter alia*, presenting explicit constitutional arguments, "relying on federal and state cases that employ a constitutional analysis, asserting the claim in terms that call to mind a specific right protected by the Constitution or alleging facts that fall well within the mainstream of constitutional litigation." *Levine v. Comm'r of Correctional Services*, 44 F.3d 121, 124 (2d Cir.1995) (quotation marks and citations omitted); *accord Daye v. Att'y Gen. of State of New York*, 696 F.2d at 192–93 ("the nature or presentation of the claim must have been likely to alert the court to the claim's federal nature").

█ Federal courts are barred from addressing the merits of claims that were "procedurally defaulted" by the petitioner in state court. *See, e.g., Fama v. Comm'r of Correctional Services*, 235 F.3d 804, 809 (2d Cir.2000). A procedural default in state court constitutes an independent and adequate ground for the state court judgment of conviction and, although such claims are considered technically "exhausted" for habeas corpus purposes, they are not subject to review by the federal court. *See, e.g., Reyes v. Keane*, 118 F.3d 136, 139 (2d Cir.1997); *Bossett v. Walker*, 41 F.3d 825, 829 (2d. Cir.1994). The federal court may only address the merits of a procedurally defaulted claim if the petitioner can establish cause and prejudice for the default, or if he can show a "fundamental miscarriage of justice." *See, e.g., Gray v. Netherland*, 518 U.S. 152, 161–62, 116 S.Ct. 2074, 135 L.Ed.2d 457 (1996); *Coleman v. Thompson*, 501 U.S. 722, 731–32, 735 n. *, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991); *Murray v. Carrier*, 477 U.S. 478, 488, 494, 106 S.Ct. 2639, 91 L.Ed.2d 397 (1986); *Strogov v. Att'y Gen. of the State of New York*, 191 F.3d 188, 193 (2d Cir.1999).

## III. ANALYSIS OF SANTANA'S CLAIMS

### A. *Claim One: Insufficient evidence to convict for felony murder*

In his first ground for habeas relief, Santana asserts that

[t]he People's evidence, which failed to prove that either appellant or the co-defendant fired the fatal shot, but instead demonstrated that a police officer accidentally killed the deceased ... was insufficient to convict appellant of felony murder, and further, the submission of the concomitant theory to the jury that 'but for' appellant's act the officer would not have been killed, and ... that appellant could be convicted if he set in motion a chain of events which resulted in

the death of the deceased deprived appellant of a Fair Trial.

Habeas Petition, ¶ A. Construing this claim liberally, *see Haines v. Kerner*, 404 U.S. 519, 520–21, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972), it appears Santana argues that he was deprived of his right to a fair trial because there was insufficient evidence to convict him of felony murder and, specifically, that the jury could not convict Santana solely on the ground that Santana "set in motion a chain of events which resulted in the death of" Trooper Aversa without the additional proof that Santana or his co-defendant had actually fired the fatal shot.

1. *Procedural Requirements and Standard of Review*

■ a. *Exhaustion.* Santana has properly exhausted this claim by presenting it to the Appellate Division and to the New York State Court of Appeals. While Santana relied exclusively on State court precedent in presenting his claim to these courts, *see* Brief for Defendant–Appellant at 26–37; S. Br. at 25–43, Santana did cite to the Fourteenth Amendment in the point heading of his briefs. *See* Brief for Defendant–Appellant at 26; S. Br. at 25. Inasmuch as such a mention of a constitutional provision has been held to be sufficient to preserve a constitutional claim in a habeas petition, the Court will consider it. *See Reid v. Senkowski*, 961 F.2d 374, 376 (2d Cir.1992) (citation to the Fourteenth Amendment in point heading of petitioner's brief satisfied the exhaustion requirement for habeas review purposes); *accord Daye v. Attorney General of the State of New York*, 696 F.2d at 192 ("if the petitioner has cited the state courts to the specific provision of the Constitution relied on in his habeas petition, he will have fairly presented his legal basis to the state courts").

In addition, New York State case law makes clear that the "legally sufficient evidence" standard derives from the federal constitutional due process right discussed in *Jackson v. Virginia*, 443 U.S. 307, 316, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979) (holding that a criminal defendant has a due process right not to be convicted on legally insufficient evidence). The New York Court of Appeals, in applying this standard, has frequently adverted to the *Jackson* case itself. *See, e.g. People v. Contes*, 60 N.Y.2d 620, 621, 467 N.Y.S.2d 349, 454 N.E.2d 932 (1983); *People v. Taylor*, 94 N.Y.2d 910, 911, 707 N.Y.S.2d 618, 729 N.E.2d 337 (2000). The New York Court of Appeals' decision in Santana's case cited at least one case that cites *Jackson. People v. Hernandez*, 82 N.Y.2d at 318, 604 N.Y.S.2d 524, 624 N.E.2d 661 (citing *Matter of Anthony M.*, 63 N.Y.2d 270, 280, 481 N.Y.S.2d 675, 471 N.E.2d 447 (1984)). Thus, Santana properly exhausted his due process claim in the New York courts. *See, e.g., Cowan v. Artuz*, 96 F.Supp.2d 298, 307 (S.D.N.Y.2000) (for exhaustion purposes, a claim in New York State court regarding sufficiency of evidence raises issue of federal due process).

b. *Standard of Review.* With respect to the standard of review to be employed, the Antiterrorism and Effective Death Penalty Act of 1996, P.L. No. 104–132, 110 Stat. 1214 ("AEDPA"), provides that

> [a]n application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States....

28 U.S.C. § 2254(d).

As an initial matter, there can be no doubt that Santana's claim is one that is based on

"clearly established Federal law, as determined by the Supreme Court." Although Santana's claim differs from the precise claim raised in *Jackson*, Santana's claim represents merely a "case-specific" application of the *Jackson* standard and thus qualifies as a claim based on "clearly established Federal law" for purposes of 28 U.S.C. § 2254(d)(1). *See Sellan v. Kuhlman*, 261 F.3d 303, 2001 WL 909323 at *3 (2d Cir. August 14, 2001).

■ The applicability of the statutory standard of review is unaffected by the fact that the New York State Court of Appeals in Santana's case did not allude to federal law in its decision. The Second Circuit has recently concluded that the AEDPA standard applies regardless of whether the state court has discussed the federal claim or any federal law in an opinion adjudicating the state law conviction. In *Sellan v. Kuhlman*, the Second Circuit held that:

> [f]or the purposes of AEDPA deference, a state court "adjudicate[s]" a state prisoner's federal claim on the merits when it (1) disposes of the claim "on the merits," and (2) reduces its disposition to judgment. When a state court does so, a federal habeas court must defer in the manner prescribed by 28 U.S.C. § 2254(d)(1) to the state court's decision on the federal claim—even if the state court does not explicitly refer to either the federal claim or to relevant federal case law.

*Sellan*, 261 F.3d 303 at 312, 2001 WL 909323 at *6. Here, the Court of Appeals disposed of Santana's claim on the merits and entered a judgment to that effect. Thus, the deferential standard of review contained in 28 U.S.C. § 2254 applies.

The AEDPA standard requires this Court to determine if the New York courts' adjudication was "contrary to, or involved an unreasonable application of,

clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). *Accord Gomez v. Acevedo*, 106 F.3d 192, 199 (7th Cir.) ("[A] writ of habeas corpus may be issued for evidence insufficiency only if the state courts have unreasonably applied the *Jackson* standard. Federal review of these claims therefore now turns on whether the state court provided fair process and engaged in reasoned, good-faith decision making when applying *Jackson's* 'no rational trier of fact' test.") (citations omitted), *vacated and remanded on other grounds*, 522 U.S. 801, 118 S.Ct. 37, 139 L.Ed.2d 6 (1997). Under this standard, "a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Williams v. Taylor*, 529 U.S. 362, 411, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000).

## 2. The Merits of Santana's Claim

■ The due process clause of the Fourteenth Amendment protects a defendant from conviction of a crime unless there is proof beyond a reasonable doubt of every fact necessary to constitute the crime with which the defendant has been charged. *See Jackson v. Virginia*, 443 U.S. at 316, 99 S.Ct. 2781. Accordingly, when challenging a state conviction pursuant to 28 U.S.C. § 2254, a petitioner will be "entitled to habeas corpus relief if it is found that upon the record evidence adduced at the trial no rational trier of fact could have found proof of guilt beyond a reasonable doubt." *Jackson*, 443 U.S. at 324, 99 S.Ct. 2781; *accord Farrington v. Senkowski*, 214 F.3d 237, 240–41 (2d Cir. 2000). A federal court considering the sufficiency of a state law conviction "must

look to state law to determine the elements of the crime," *Fama v. Comm'r of Correctional Services*, 235 F.3d at 811 (citation omitted); *accord Quartararo v. Hanslmaier*, 186 F.3d 91, 97 (2d Cir.1999), and consider whether "there was sufficient evidence for a jury to find that the prosecution proved the substantive elements of the crime as defined by state law." *Einaugler v. Supreme Court of State of New York*, 109 F.3d 836, 839 (2d Cir.1997) (citations omitted); *accord Malsh v. Hanslmaier*, 102 F.3d 69, 70 (2d Cir.1996).

■ Moreover, the evidence must be viewed in the light most favorable to the state and all permissible inferences must be construed in its favor. *See, e.g., United States v. Strauss*, 999 F.2d 692, 696 (2d Cir.1993); *accord Reddy v. Coombe*, 846 F.2d 866, 869 (2d Cir.) (court must "credit every inference that could have been drawn in the State's favor, ... whether the evidence being reviewed is direct or circumstantial") (citations omitted), *cert. denied*, 488 U.S. 929, 109 S.Ct. 316, 102 L.Ed.2d 334 (1988). The Second Circuit has held that an insufficiency challenge does not rise to constitutional dimensions "absent a record so totally devoid of evidentiary support that a due process issue is raised." *Mapp v. Warden, New York State Corr. Inst. for Women*, 531 F.2d 1167, 1173 n. 8 (2d Cir.1976) (citation omitted).

The charge at issue in this case is denominated Murder in the Second Degree. Under Penal Law § 125.25(3), a person is guilty of this crime when

[a]cting either alone or with one or more other persons, he commits or attempts to commit robbery ... and, in the course of and in furtherance of such crime or of immediate flight therefrom, he, or another participant, if there be any, causes the death of a person other than one of the participants.

Santana's claim is that the evidence did not permit the jury to find that he "caused" the death of Trooper Aversa.

■ On a number of occasions prior to deciding Santana's appeal, the Court of Appeals had issued rulings on the meaning of the term "causes" both in the context of Penal Law § 125.25(3) (the felony murder statute) and the other portions of the murder statute, New York Penal Law §§ 125.25(1), 125.25(2).[3] In *People v. Kibbe*, 35 N.Y.2d 407, 362 N.Y.S.2d 848, 321 N.E.2d 773 (1974), for example, the defendants were held to have "caused" a victim's death when they left him drunk by the side of an unlit road in subfreezing temperatures. The victim was subsequently killed by a passing truck. In upholding the defendants' conviction, the Court announced that, in evaluating criminal liability with respect to the felony murder statute, it is enough that the "defendants' actions [are a] sufficiently direct cause of the ensuing death" so that the fatal result was "something which should have been foreseen as being reasonably related to the acts of the accused." 35 N.Y.2d at 412, 362 N.Y.S.2d 848, 321 N.E.2d 773 (emphasis omitted).

Later precedent makes clear that a "direct" cause does not mean either "immedi-

---

3. The Court of Appeals noted in the decision on Santana's case that the term " 'causes' in the felony murder provision should be accorded the same meaning it is given in subdivisions (1) and (2) of section 125.25 of the Penal Law." *People v. Hernandez*, 82 N.Y.2d at 317, 604 N.Y.S.2d 524, 624 N.E.2d 661. The Court of Appeals' analysis of these state statutory provisions, in cluding its analysis of the change effectuated by the 1974 amendments to the felony murder provision, represents an interpretation of state law that is not "arbitrary or capricious," *Lewis v. Jeffers*, 497 U.S. 764, 780, 110 S.Ct. 3092, 111 L.Ed.2d 606 (1990), and thus must be respected by this Court.

ate" or "unaided." *People v. Stewart,* 40 N.Y.2d 692, 697, 389 N.Y.S.2d 804, 358 N.E.2d 487 (1976). The Court of Appeals has recognized that "[e]ven an intervening, independent agency will not exonerate defendant unless 'the death is solely attributable to the secondary agency, and not at all induced by the primary one.'" *Matter of Anthony M.,* 63 N.Y.2d 270, 280, 481 N.Y.S.2d 675, 471 N.E.2d 447 (1984) (citation omitted) (defendant found guilty of felony murder where the robbery of elderly victim caused a cardiac arrest which resulted in death days after the actual robbery). Cases involving statutes other than murder have also recognized that a defendant may "cause" a death even when the final link in the chain is inflicted by the act of the victim him- or herself, as long as the defendant has set the chain of events in motion and the result is foreseeable. *See, e.g., People v. Duffy,* 79 N.Y.2d 611, 612, 584 N.Y.S.2d 739, 595 N.E.2d 814 (1992) (rejecting claim that victim's "act of loading the rifle and using it to kill himself constituted an intervening cause"); *People v. Galle,* 77 N.Y.2d 953, 955, 570 N.Y.S.2d 481, 573 N.E.2d 569 (1991) (defendant who injected victim with two doses of cocaine still "caused" victim's death even though she did not die until she had injected herself with additional doses).

Similarly, the Court of Appeals has recognized that a death may be "foreseeable" even where the death flows from an unexpected or unusual occurrence. In *Kibbe,* for example, the Court found the victim's death foreseeable even though it was "just as likely" that the victim might have been saved by a passerby. 35 N.Y.2d at 413, 362 N.Y.S.2d 848, 321 N.E.2d 773. *See also People v. Ingram,* 67 N.Y.2d 897, 899, 501 N.Y.S.2d 804, 492 N.E.2d 1220 (1986) (crime victim's heart attack was "foreseeable"); *Matter of Anthony M.,* 63 N.Y.2d at 280, 481 N.Y.S.2d 675, 471 N.E.2d 447 (same).

A case with facts similar to the instant case arose shortly after Santana's appeal was decided in *People v. Matos,* 83 N.Y.2d 509, 510, 611 N.Y.S.2d 785, 634 N.E.2d 157 (1994). In *Matos,* the defendant Matos and his accomplices had robbed the employees of a McDonald's restaurant at gunpoint. *Id.* at 510, 611 N.Y.S.2d 785, 634 N.E.2d 157. Police officers arrived while the robbers were still at the store. *Id.* Matos then attempted to escape up a ladder to the roof. *Id.* at 511, 611 N.Y.S.2d 785, 634 N.E.2d 157. An officer pursuing Matos up the ladder fell from the ladder down an air shaft and was killed. *Id.* The Court of Appeals held that because it was "foreseeable" that the defendant would be pursued by an officer and that it was also foreseeable that someone might fall while in pursuit of him, Matos had "caused" the death of the officer. *Id.* at 512, 611 N.Y.S.2d 785, 634 N.E.2d 157. The Court held that the requirement that the defendant "cause" the death of an individual is fulfilled where there is evidence that the defendant's actions were an "actual contributory cause of death" and the defendant "sets in motion the events which ultimately result in the victim's death." 83 N.Y.2d at 511, 611 N.Y.S.2d 785, 634 N.E.2d 157 (citing *People v. Stewart,* 40 N.Y.2d 692, 697, 389 N.Y.S.2d 804, 358 N.E.2d 487 (1976); *People v. Kibbe,* 35 N.Y.2d 407, 362 N.Y.S.2d 848, 321 N.E.2d 773). The Court noted that a defendant's acts need not be the sole cause of death. *Matos,* 83 N.Y.2d at 511, 611 N.Y.S.2d 785, 634 N.E.2d 157 (citing *Matter of Anthony M.,* 63 N.Y.2d 270, 481 N.Y.S.2d 675, 471 N.E.2d 447).

In the opinion deciding Santana's own appeal, the Court of Appeals announced a result consistent with the decision in the *Kibbe* case: that a defendant can be liable under Penal Law § 125.25(3) if "the fatal result was the sufficiently direct and fore-

seeable result of [the defendant or co-defendant's] acts." *People v. Hernandez*, 82 N.Y.2d at 318, 604 N.Y.S.2d 524, 624 N.E.2d 661. The Court stated:

> The jury was properly charged that more than "but for" causation was required; that it must find the fatal result was the sufficiently direct and foreseeable result of Hernandez's acts . . . .
>
> The evidence established that Hernandez, when confronted by the officers in the courtyard, refused to surrender and continued to move toward one officer with his gun drawn. Immediate flight and attempts to thwart apprehension are patently within the furtherance of the cofelons' criminal objective . . . . Moreover, it was highly foreseeable that when Hernandez continued toward the officer with his gun drawn that shots would be fired and someone might be hit. Foreseeability does not mean that the result must be the most likely event. Undoubtedly, in planning the robbery, defendants did not anticipate that their victim would be a State Trooper or that a back-up unit would be on the scene. Yet, it was foreseeable that police would try to thwart crime . . ., and Hernandez was aware that police were on the scene at the point he resisted arrest and remained armed. As the Appellate Division concluded, it is simply implausible for defendants to claim that defendants could not have foreseen a bullet going astray when Hernandez provoked a gun battle outside a residential building in an urban area.

*Hernandez*, 82 N.Y.2d at 318–19, 604 N.Y.S.2d 524, 624 N.E.2d 661 (citations omitted).

■ A rational trier of fact could have concluded from the evidence in this case that the death of Trooper Aversa during the shootout was a "direct and foreseeable result" of Santana and Hernandez's ac-

tions. The felony murder statute provides that Santana is liable if *any* participant (not just the defendant) "causes" the death of another individual. There can be no question that a rational jury could conclude that the actions of Santana and Hernandez together caused the death of Trooper Aversa within the meaning of New York law. Santana actively participated in a gunpoint robbery. He viciously attacked Detective Mendez. Both he and Hernandez struggled with Detective Mendez while he had a gun and after Detective Mendez had identified himself as a police officer. Santana then bit the Detective and only fled when the officer began firing shots at him and Hernandez.

Given these events, it was foreseeable that a gun battle would have been provoked and that someone would be struck by a bullet from that gun battle and die as a result. While the ultimate harm resulting from Santana's actions was inflicted by an officer, that officer was drawn to the scene by Santana's own planned crime and the harm he caused was precipitated by Santana's own efforts in carrying out that crime. As a result, Trooper Aversa's death was "reasonably related to the acts of the accused." *Kibbe*, 35 N.Y.2d at 412, 362 N.Y.S.2d 848, 321 N.E.2d 773.

■ The Court of Appeals did not engage in an "unreasonable" application of the *Jackson* standard, *Williams v. Taylor*, 529 U.S. 362 at 411, 120 S.Ct. 1495, 146 L.Ed.2d 389, when it concluded that there was sufficient evidence for a rational jury could find that Trooper Aversa's death was "the sufficiently direct and foreseeable result" of Santana and Hernandez's actions. *People v. Hernandez*, 82 N.Y.2d at 318, 604 N.Y.S.2d 524, 624 N.E.2d 661. As the Court of Appeals noted, "it is simply implausible for defendants to claim that defendants could not have foreseen a bullet going astray when Hernandez provoked a

gun battle outside a residential building in an urban area." 82 N.Y.2d at 319, 604 N.Y.S.2d 524, 624 N.E.2d 661. The Court of Appeals thus "reasonably" determined that a "rational" jury could conclude that Santana had committed felony murder.[4]

For these reasons, the petition should be denied with respect to the first claim for relief.

### B. Claim Two: Deprivation of equal protection and due process of law

In his second ground for habeas relief, Santana claims "[t]he State Court altered the meaning of the Statute, thereby depriving the petitioner of his Constitutional right to Due Process of Law." See Habeas Petition, ¶ B. In his memorandum of law, Santana further explains that the trial court deprived him of equal protection and due process of the law by incorrectly applying Penal Law § 125.25(3). See Memorandum of Law of Osvaldo Santana, dated April 15, 1997, at 5–6.[5]

As stated earlier, in order for a federal court to review the merits of a habeas petition, the petitioner's claims must first be presented to the state court in constitutional terms. See 28 U.S.C. § 2254(b)(1); O'Sullivan v. Boerckel, 526 U.S. at 842, 119 S.Ct. 1728; Duncan v. Henry, 513 U.S. at 365–66, 115 S.Ct. 887; Daye v. Att'y Gen. of the State of New York, 696 F.2d at 192–93 ("the nature or presentation of the claim must have been likely to alert the court to the claim's federal nature"). To the extent Santana intends this second claim to differ from his first claim, it was never presented to the Appellate Division or to the New York State Court of Appeals. Santana can no longer raise these claims in State court, see New York Criminal Procedure Law § 470.05(2); New York Court Rules § 500.10(a), and thus they are procedurally defaulted. See Fama v. Comm'r of Correctional Services, 235 F.3d at 809; Bossett v. Walker, 41 F.3d at 829.

---

**4.** To the extent Santana attacks the trial court's instructions to the jury, this claim must fail because the instructions were congruent with the law of felony murder as articulated by the New York state courts. The trial court instructed the jury that it "may find the defendant criminally responsible for Trooper Aversa's death" if it "conclude[d] that the defendant's conduct was both an actual and a sufficiently direct cause of death... That is, you must determine that the defendant's conduct forged a link, in the chain of causation, that ultimately resulted in the death of Trooper Aversa," (Tr. 3716–17), and that "the death must be a reasonable, foreseeable consequence of the defendant's conduct." (Tr. 3720). The trial court accurately reflected New York Law when it told the jury:

If it is reasonably foreseeable that a person would be shot and killed during an armed robbery, or in the immediate flight therefrom, then it is immaterial that the defendant did not intend the Trooper's death. If the Trooper would not have died but for the defendant's actions, and such a death

was a reasonably foreseeable and sufficiently direct consequence of the defendant's conduct, then the jury may find that the defendant caused the Trooper's death.

On the other hand, if you find that the Trooper's death was too remote from the defendant's own course of conduct, or too unlikely, or not reasonably foreseeable, if you find that the connection between the defendant's conduct and the Trooper's death is weak and attenuated, then there is no proximate causation, and the defendant cannot be found to have caused the death. (Tr. 3720–21).

**5.** In the memorandum, Santana also makes a brief allusion to New York Criminal Procedure Law §§ 270.30. 310.20 and 310.30, and alleged irregularities in the jury deliberations and verdict. It is impossible to discern what arguments Santana is attempting to make with respect to these statutes. In any event, any such claims are unexhausted and therefore barred from habeas review.

■ Where a petitioner can no longer raise a claim in state court, the claim will be deemed to be "technically exhausted" for purposes of federal habeas corpus review. *See, e.g., Reyes v. Keane,* 118 F.3d at 139. However, even though a claim is technically exhausted for federal habeas review purposes, the habeas court may not address the claim unless the petitioner can establish cause and prejudice for the default, or if he can show a "fundamental miscarriage of justice." *See, e.g., Gray v. Netherland,* 518 U.S. at 161–62, 116 S.Ct. 2074; *Coleman v. Thompson,* 501 U.S. at 731–32, 735, 111 S.Ct. 2546 at n. *; *Murray v. Carrier,* 477 U.S. at 488, 494, 106 S.Ct. 2639; *Strogov v. Att'y Gen. of the State of New York,* 191 F.3d at 193. Santana has offered no explanation for his failure to raise this claim in State court. While he asserts his innocence, the assertion is based solely on the same argument already rejected by this Court—that is, that the elements of the felony murder charge were not proved against him. Accordingly, this second ground should be dismissed because it has been procedurally defaulted.

■ In any event, Santana's claim would have to be dismissed on the merits. Santana's claim of denial of due process and equal protection is premised on his contention that the Court of Appeals "altered the meaning" of New York Penal Law § 125(3), "imposing a heavier burden on the petitioner." Habeas Petition, ¶ B. Case law supports the contention that a federal habeas court may review a State Court's application of a statutory standard, but only where such a review is "limited, at most, to determining whether the state court's finding was so arbitrary or capricious as to constitute an independent due process ... violation." *Lewis v. Jeffers,* 497 U.S. at 780, 110 S.Ct. 3092 (reviewing state court's interpretation of "aggravating

circumstances" in death penalty prosecution). Santana's argument must fail because his premise—that the State Court "altered the meaning" of the felony murder statute—is itself without merit. As already described *supra,* the Court of Appeals was consistent in its interpretation of the causation requirement of New York Penal Law 125(3). The ruling in Santana's case derived from prior Court of Appeals' cases interpreting the causation requirement to include the reasonably "foreseeable" acts resulting from a defendant's actions. The Court of Appeals thus did not "alter[ ] the meaning" of the felony murder statute and its ruling upholding Santana's conviction was therefore not "arbitrary or capricious." *Lewis v. Jeffers,* 497 U.S. at 780, 110 S.Ct. 3092.

*Conclusion*

For the foregoing reasons, Santana's petition should be denied.

### *Notice of Procedure for Filing of Objections to this Report and Recommendation*

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties have ten (10) days from service of this Report to file any written objections. *See also* Fed.R.Civ.P. 6. Such objections (and any responses to objections) shall be filed with the Clerk of the Court, with courtesy copies delivered to the chambers of the Honorable Richard M. Berman, 40 Centre Street, New York, New York 10007, and to the chambers of the undersigned at the same address. Any requests for an extension of time to file objections must be directed to Judge Berman. The failure to file timely objections will result in a waiver of those objections for purposes of appeal. *See Thomas*

*v. Arn,* 474 U.S. 140, 155, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985).

September 26, 2001.