■ THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v RIO JACKSON, Appellant. [838 NYS2d 108]—

Appeal by the defendant from a judgment of the Supreme Court, Queens County (Katz, J.), rendered April 16, 2004, convicting him of robbery in the first degree (five counts), robbery in the second degree (six counts), grand larceny in the second degree, and burglary in the second degree (two counts), upon a jury verdict, and imposing sentence.

Ordered that the judgment is affirmed.

Contrary to the defendant's contention, he was not deprived of his right to present a defense as a result of the trial court's refusal to grant him a continuance to secure the testimony of Tahira Bailey, who had given certain alibi testimony at the defendant's first trial, which had ended in a mistrial. The decision of whether to grant a continuance is a matter that is committed to the trial court's sound discretion (*see People v Foy,* 32 NY2d 473, 476 [1973]). However, where, as here, the protection of fundamental rights is involved, the court's discretion is "more narrowly construed" (*People v Spears,* 64 NY2d 698, 699-700 [1984]).

Although there is no "mechanical rule" to be followed when determining whether or not to grant a continuance to secure testimony that might further a defense, one consideration is whether the defendant has diligently and in good faith attempted to secure the witness's presence (*see People v Foy, supra* at 476). Here, the defendant, whose first trial concluded three

months before the commencement of his second trial, had ample time to insure Bailey's presence at the second trial, yet failed to do so (*see People v Drummond*, 233 AD2d 339 [1996]; *People v Daniels*, 128 AD2d 632 [1987]; *People v Hayes*, 116 AD2d 737 [1986]).

Another consideration is whether a continuance has previously been sought (*see People v Singleton*, 41 NY2d 402, 405-407 [1977]). Here, the trial court had already granted a prior application that the defendant had made for a continuance to secure Bailey's testimony (*see People v Savareese*, 258 AD2d 484, 485 [1999]; *People v Perez*, 249 AD2d 492, 493 [1998]; *People v Drummond, supra* at 339).

Yet another consideration is whether the witness's testimony would be cumulative (*see People v Rodriguez*, 188 AD2d 494, 494-495 [1992]). That was the case here. While Bailey might have provided alibi testimony, the defendant, who was accused of robbing a jewelry store, adduced alibi testimony from another witness, who, as Bailey did at the first trial, averred that the defendant was actually at home while the robbery was being committed (*see People v Nieves*, 290 AD2d 371, 372 [2002]).

In light of these considerations, we cannot conclude, as our dissenting colleague does, that the trial court improvidently exercised its discretion in denying the defendant's application for a second continuance. Furthermore, contrary to the defendant's contention, under the circumstances, the trial court also properly denied his alternative application to have Bailey's testimony from the first trial introduced into evidence at the second trial (*see* CPL 670.10 [1]).

The defendant contends that he was deprived of his right to a fair trial by virtue of certain remarks made by the prosecutor on summation. His contention that the prosecutor impermissibly shifted the burden of proof by questioning the defendant's failure to produce a second alibi witness or to call additional family members to testify on his behalf is unpreserved for appellate review, since he failed to seek curative instructions or move for a mistrial when his objections were sustained (*see* CPL 470.05 [2]; *People v Hines*, 18 AD3d 882, 883-884 [2005]; *People v Morris*, 2 AD3d 652, 653 [2003]). The defendant's contention that he was deprived of a fair trial by the prosecutor's assertion that no person can provide a detailed description of another person unless he or she has artistic training, a conclusion that went beyond the facts adduced at trial, is unpreserved for appellate review since the defendant failed to make a timely objection to the comment. His challenge to the prosecutor's characterization of the defense strategy as "insulting to the intelligence"

and "silly" is unpreserved for appellate review for the same reason, as is his contention that the prosecutor mischaracterized the defense by suggesting that the defendant took the position that the complainants falsely accused the defendant for no reason whatsoever. The defendant's contention that the prosecutor improperly vouched for the credibility of the People's witnesses is likewise unpreserved for appellate review since the defendant failed to make a timely or specific objection to the challenged comment. In any event, all of the challenged remarks were both fair comment on the evidence (see People v Ashwal, 39 NY2d 105, 109 [1976]), and responsive to arguments and issues raised by the defense (see People v Shagi, 288 AD2d 495, 496 [2001]).

The defendant's contention that the prosecutor improperly failed to turn over certain reports in violation of People v Rosario (9 NY2d 286 [1961], cert denied 368 US 866 [1961]), which is raised for the first time on appeal in his supplemental pro se brief, is based on matter dehors the record, and cannot be reviewed on this direct appeal from the judgment (see People v Rescigno, 248 AD2d 564, 565 [1998]; People v Bell, 161 AD2d 772, 772-773 [1990]). Schmidt, J.P., Santucci and Covello, JJ., concur.

Fisher, J. (dissenting and voting to reverse the judgment and order a new trial): The conduct of a criminal trial in accordance with an agreed-upon schedule offers benefits to both the prosecution and the defense, and reduces inconvenience to jurors. But there are times when a court's concern for keeping to a promised schedule can abridge a defendant's basic rights, and undermine the integrity and fairness of the trial itself. In the unusual circumstances of this case, I conclude that the trial court's refusal to grant the defendant's request for an additional one-day continuance to produce a proven alibi witness had that effect. Therefore, I respectfully dissent and would order a new trial.

At about 6:30 P.M. on January 4, 2003, Khedr Khouli and Lourdes Hernandez were working in the front area of a Queens jewelry store that Khouli owned. Cristian Piedra, a jeweler, was working in the middle room of the store, and two salespersons, Jennifer Maimone and Monica Wraga, were eating in the back. Two black men, one tall and one short, appeared at the door and sought entry into the store. After Khouli buzzed them in, the taller man showed him a chain and asked how much it weighed. Khouli weighed the chain and, as he turned back to face the two men, they suddenly drew guns.

The two men ushered Khouli and Hernandez toward the back

of the store, and ordered Piedra to join them. At some point, one or both of the men had their faces covered. In the back, they encountered Maimone and Wraga and Ordered everyone to lie on the floor. The taller man demanded that all of the store personnel hand over their jewelry and money. Thereafter, the shorter man took Maimone to the cash register and then to the safe, where he removed cash and jewelry. The robbers also took the surveillance video and stole additional jewelry from the middle and front areas of the store. At one point, Hernandez asked the shorter man if he was "going to hurt us." The man replied, "No, mommy. I'm not going to hurt you." The men instructed everyone to remain on the floor. They then made their escape with about $120,000 worth of jewelry and the sum of $50,000 in cash.

Approximately two weeks later, on January 19, 2003, Hernandez was working at a different Queens jewelry store owned by Khouli and his brother, when a black man on a bicycle asked to be buzzed in. He was the defendant, Rio Jackson, and Hernandez immediately believed she recognized him as the shorter participant in the robbery. Nevertheless, she buzzed him into the store and watched from the back as he spoke with another salesperson. The defendant gave his correct name and address, and asked to have an earring repaired. The salesperson took the earring and told the defendant to return the next day to pick it up. Hernandez recognized the defendant's voice when he called the salesperson "something like . . . mommy."

Hernandez called Khouli and later spoke with a detective, telling him that a man she recognized as one of the robbers had been in the store and would return the next day. The following day, detectives waited in the store and, when the defendant appeared as scheduled to pick up the earring, Hernandez identified him and the detectives took him into custody. The same day, the defendant was placed in a series of lineups viewed, in turn, by Khouli, Maimone, Piedra, and Wraga, and by Vincent Spotto, a customer who had been in front of the store during the robbery. Of these, only Maimone identified him.

The defendant subsequently was indicted on a number of counts of robbery, burglary, and grand larceny. At his trial, the prosecution's case rested entirely on the identification testimony of Hernandez and Maimone. No other evidence linked the defendant to the crime. The defense presented an alibi, calling two witnesses. The first was the defendant's sister, who testified that, on the afternoon and evening of the day of the robbery, the defendant had been at home, and that she remembered serving him dinner at approximately the time the robbery allegedly occurred.

The second alibi witness was Tahira Bailey, who knew the defendant only as the neighbor of her friend who lived in the building next to the defendant's family home. Bailey was a graduate of Morgan State University, and held a degree in marketing. She had served in the United States Army as a lieutenant in military intelligence until her honorable discharge, and was employed by the federal Transportation Security Administration as a security screener at John F. Kennedy International Airport (hereinafter JFK). There was no evidence that she had any family or social connections with the defendant. Bailey testified that, on the day of the robbery, she was supposed to meet her friend who lived next door to the defendant. She arrived at her friend's home between 6:20 and 6:25 P.M., but received no response when she rang her friend's doorbell. She saw the defendant and, as she had in the past, asked for his help. At her request, the defendant went to the backyard and threw some pebbles at his neighbor's window to attract his attention, but there was still no response. After chatting with the defendant, Bailey left at approximately 7:10 P.M.

At the close of evidence, the jury deadlocked. A mistrial was declared and a retrial was ordered.

The second trial began some three months later. Jury selection was completed, and opening statements were given on Tuesday, March 9, 2004. In the course of the defense counsel's opening statement, he told the jurors that they would hear from one of the defendant's family members and from another person who "has absolutely no tie to him other than knowing him from the neighborhood. None. No ax to grind. No medals. No money. No glory. She was just with him and she knows she was with him." Evidence began the next day and, again, the prosecution relied entirely on the identification testimony of Hernandez and Maimone, without any other evidence connecting the defendant to the crime. The prosecution presented its entire case in one day, and rested. When the defense counsel indicated that he would present evidence on behalf of the defendant, the court said: "Fine. You will have some witnesses tomorrow and we will have summations and charge. Be prepared to do that."

The next day, Thursday, March 11, 2004, before the jury was brought into the courtroom, the following exchange occurred on the record:

"[DEFENSE COUNSEL]: As I indicated to your Honor, we're having trouble getting ahold of the second witness. One of them is here today. I'm constrained to ask for a continuance until Monday to serve a subpoena on her and see if we can find her and get her to appear before the Court to testify. I know her ad-

dress and I know where she works. Then I will have the investigator try to do that today or first thing tomorrow morning.

"THE COURT: Well, what I will do, I will tell the jury that after the witness testifies today you wish to continue with your case but you're unable to do so until Monday and I'm going to assure that the case will be over on Monday.

"[DEFENSE COUNSEL]: Yes, your Honor.

"THE COURT: Summation and charge on Monday. All right.

"[DEFENSE COUNSEL]: Yes, sir."

The defendant's sister then testified, as she had at the first trial, that the defendant had been at home at the time of the crime. Thereafter, the case was adjourned to Monday morning, March 15, 2004, for the presentation of the alibi testimony of Tahira Bailey, to be followed by summations and the charge to the jury. The trial court advised the jury that "[t]his case, no matter what happens . . . will be over on Monday morning, or at least on Monday. We will have summations and charge and proceed. If [defense counsel] can proceed, he will proceed. I'm going to give him that period."

On Monday morning, the defense counsel reported that he had been unable to secure Bailey's attendance. Counsel stated that an investigator had gone to her home address twice on Friday and once on Saturday, but had been unable to locate her. He left a copy of a subpoena "on her door in her mailbox." The defense counsel handed up an affidavit attesting to the attempt to locate Bailey and serve her with a subpoena. Counsel further stated that the defense had contacted a person at one of the firms that provided security at JFK, who said that the only way to find Bailey would be to go into the "federal listing" for each individual area in the airport in order to ascertain where and on what shift or shifts she may be working. According to the defense counsel, the individual who could perform that search had not been working on Sunday.

The defense counsel then proposed a few alternative courses of action. He suggested that Bailey's testimony, given at the earlier trial, be admitted for the jury to consider. Failing that, the defense counsel proposed that a stipulation be entered that Bailey was unavailable but that, if she were called and asked about the evening in question from 6:20 to 7:15, "she [would] claim[ ] to have been with a person known to her as Mr. Jackson." The prosecutor objected to both proposals on the ground that the defense had not shown due diligence in attempting to find Bailey. When the defense counsel confirmed

that he had unsuccessfully telephoned her several times, the trial court offered that "[s]he doesn't want to testify [and] [t]here may be many reasons for that." The trial court did not elaborate on what those reasons might be.

Finally, the defense counsel asked, as the only remaining alternative, for one additional day to attempt to locate Bailey. He stated: "Judge, just for the record, I am ready and willing to send somebody out there today at my expense . . . to try to locate her." In denying the request for the continuance, the trial court observed: "[W]e have 14 citizens here. I gave them a lot of time. There are jurors here that have other things to do. There are two of them that are teachers. They have parent/ teacher conferences to go to. They have to do that. We will give them time to do that. But you agreed Thursday that you would have a witness here or that will be the end of the case. I told the jurors that because you agreed to it. And I'm denying your application."

The defendant unsuccessfully moved for a mistrial, the defense rested, and summations began. In his final argument, the prosecutor, inter alia, discussed the defendant's sister's testimony and then stated: "What about the second witness? Where is it [sic]? Are there going to be two witnesses here who are going to testify as to the defendant's presence and whereabouts on January 4, 2003?" And, reminding the jury of the defense counsel's opening statement, the prosecutor added, "I believe [counsel] said that to you. How many witnesses did you get? One. Where is this other witness?" The defense counsel promptly objected to this comment and, after sustaining the objection, the trial court admonished the prosecutor not to "ask the jury to speculate."

The jury convicted the defendant of five counts of robbery in the first degree, six counts of robbery in the second degree, one count of grand larceny in the second degree, and two counts of burglary in the second degree. The Supreme Court sentenced the defendant to concurrent terms, the maximum of which was a determinate term of imprisonment of 18 years. In my view, the defendant is entitled to a new trial.

"The decision whether to grant an adjournment is ordinarily committed to the sound discretion of the trial court . . . [B]ut . . . when the protection of fundamental rights [is] involved . . . , that discretionary power has been more narrowly construed" (*People v Spears,* 64 NY2d 698, 699-700 [1984]; *see People v Foy,* 32 NY2d 473, 476-477 [1973]; *Matter of John W.,* 227 AD2d 981 [1996]). Since at least 1973, the rule in New York, designed to protect the "fundamental [right] . . . of an ac-

cused to present witnesses in his [or her] own defense" (*Chambers v Mississippi*, 410 US 284, 302 [1973]), has been that, although a trial court is not required to grant an adjournment "to allow the defendant to endlessly pursue an elusive witness whose name and address are unknown, and whose existence depends on rumor or surmise . . . when the witness is identified to the court, and is to be found within the jurisdiction, a request for a short adjournment after a showing of some diligence and good faith should not be denied merely because of possible inconvenience to the court or others" (*People v Foy, supra* at 478).

It is certainly true that a defendant cannot legitimately complain of the denial of even a short adjournment to secure the presence of a witness unless he or she can demonstrate that the witness's proposed testimony would be material, noncumulative, and, of course, favorable to the defense (*see Matter of Anthony M.*, 63 NY2d 270, 283-284 [1984]; *People v Softic*, 17 AD3d 1075, 1076 [2005]; *People v Edwards*, 3 AD3d 504 [2004]; *People v Calderon*, 185 AD2d 853 [1992]). Here, the relevance and importance of Bailey's testimony to the defense cannot be questioned. This was an identification case in which only two of the six eyewitnesses who had seen the robbers identified the defendant, and there was not a scintilla of other evidence linking him to the crime. The defendant's sister testified in support of his alibi, but her family connection to him would naturally suggest bias adversely affecting her credibility. Bailey, on the other hand, had no apparent tie to the defendant or any demonstrated reason to lie for him. She was a witness of unchallenged character, whose testimony placed the defendant at home at the time of the crime, and was more than likely responsible for the refusal of one or more jurors at the first trial to convict.

The prosecutor argued, however, that the defendant was entitled to no relief because the defense had failed to demonstrate due diligence in attempting to locate Bailey for the second trial (*see People v Degondea*, 269 AD2d 243, 246 [2000]; *People v Green*, 140 AD2d 370 [1988]). I disagree. A showing, inter alia, that Bailey could not "with due diligence be found" would have been required before the defendant could have used, at his second trial, the alibi testimony Bailey had given at his first (CPL 670.10 [1]; *see People v Arroyo*, 54 NY2d 567, 571 [1982], *cert denied* 456 US 979 [1982]). But the threshold showing to obtain a short adjournment for the purpose of producing a witness at trial appears to be less stringent. As the Court of Appeals has said, the defendant need only show, inter alia, "*some diligence and good faith*" (*People v Foy, supra* at 478 [emphasis

supplied]). Here, the defense produced the witness at the first trial, and there is nothing in the trial record to suggest that defense counsel had, or should have had, any reason to believe or suspect that Bailey would be reluctant or unwilling to testify when needed at the second trial. Indeed, in his opening statement, counsel told the jurors that they would hear from her.* Counsel telephoned her several times without success, his investigator visited her home three times, leaving subpoenas, and tried to locate her at work. It was simply infelicitous that the only person the defense could identify who could search the "federal listing" to determine the precise location at JFK where Bailey worked was unavailable on Sunday. In my view, the defense's efforts to locate and produce Bailey were sufficiently diligent in the circumstances of this case to warrant the continuance sought. And, in any event, courts must proceed with caution in this area so as not to "unfairly penalize [a] defendant for [any] dilatory actions of his [or her] attorney" (*People v Congilaro*, 60 AD2d 442, 453 [1977]).

I do not mean to suggest that Bailey's appearance would have necessarily averted the defendant's conviction. The prosecution's evidence was certainly legally sufficient to support the conviction (*see People v Calabria*, 3 NY3d 80, 82 [2004]; *People v Arroyo, supra* at 578; *People v Vecchio*, 31 AD3d 674 [2006]), and the jury may well have credited the eyewitness testimony and rejected Bailey's testimony as inaccurate as to time or date. Nevertheless, I would hardly characterize the evidence in this case, consisting exclusively of the identification testimony of two of six eyewitnesses, as overwhelming. The identification of the defendant as one of the perpetrators was hotly contested, and the jury should have received all available evidence relevant to the question.

Nor do I mean to suggest that the trial judge was insensitive to the needs of the defense. He did grant an adjournment from

---

* The People argue, inter alia, that the denial of a continuance to find Bailey could not be the basis of reversal because the defendant had no constitutional right to call a witness knowing that she would commit perjury. In support of that argument, the People point to the fact that, at his sentencing, upon inquiry by the court, the defendant stated that, on the day of the robbery, he had left his house at approximately 4:45 P.M. to go to his work as a night security guard, but was apparently sent away because he arrived late. While this unsworn statement arguably contradicts at least part of his sister's alibi testimony, it hardly had the effect of conclusively disproving the alibi or rendering perjurious Bailey's sworn testimony that the defendant was back home when she saw him there between 6:20 and 7:10 P.M. that evening. In any event, the defendant's post-conviction statement, even if seen as tending to disprove his alibi, cannot serve to justify, after the fact, the trial court's denial of his request for a one-day continuance of the trial.

Thursday to Monday to allow Bailey's production (*cf. People v Singleton*, 41 NY2d 402 [1977]). The record makes clear, however, that, when faced with the unusual and unforeseeable circumstances presented to him, rather than affording the defendant an additional one-day continuance to make a final attempt to produce this proven and possibly crucial alibi witness, the trial judge chose to abide instead by his commitment to the jurors that, "no matter what happens," the case would come to an end on Monday. And he made that choice without any showing that an additional day of trial would cause hardship or serious inconvenience to any member of the jury.

In my view, as a practical matter, it is often unwise for a court in a criminal case, where so much is at stake, to give the jury an ironclad commitment as to the precise day on which a trial will end. In any event, it is clear, as the Court of Appeals has taught, that considerations of the convenience of the jurors or of anyone else must yield to the fundamental rights of an accused at a criminal trial (*see People v Foy, supra*). Because I believe that, in the highly unusual circumstances of this case, the defendant's fundamental rights were compromised for no reason other than to avoid the mere possibility of inconvenience to the jurors, my vote is to reverse and to order a new trial (*see People v Walker*, 28 AD3d 1116 [2006], *amended upon rearg* 31 AD3d 1226 [2006]).

