This opinion is uncorrected and subject to revision before
publication in the New York Reports.
--------------------------------------------------------------

No. 169
The People &c.,
        Appellant-Respondent,
        v.
Matthew A. Davis,
        Respondent-Appellant.

Thomas H. Brandt, for appellant-respondent.
Patricia M. McGrath, for respondent-appellant.

DiFIORE, Chief Judge:

In this appeal, we conclude that there was legally
sufficient evidence to support the jury's findings that
defendant's assault of the victim during a home invasion was an
actual contributory cause of the victim's death and that the

- 1 -

victim's death, induced by the stress of the violent event, was a reasonably foreseeable result of defendant's conduct. We therefore modify the Appellate Division order and remit the case to the Appellate Division.

I.

The victim was found dead on the floor of his second-floor apartment, lying amongst the remnants of his broken coffee table, two days after he was assaulted during a robbery-burglary of his home. Photographs of the scene depicted blood spatter in the living room and blood smeared on the couch, wholly consistent with a violent assault, as well as the victim's body lying among the evidence of a violent encounter. Subsequent investigation revealed the involvement of defendant and his two accomplices, Teara Fatico and Chastity Wilson. Both Fatico and Wilson were indicted and pleaded guilty. Fatico, who pleaded guilty to attempted burglary, testified at trial as an accomplice as a matter of law. The evidence at trial was as follows.

On August 21, 2011, the victim sent Fatico a private Facebook message to which defendant, Fatico's then boyfriend, responded on her behalf. In that message, defendant, acting as Fatico, informed the victim that she and Wilson would be coming over to his apartment. The three planned for Fatico and Wilson to go to the victim's apartment and determine if it contained valuables and drugs to steal. That night, defendant drove Fatico and Wilson to the victim's apartment complex, which was equipped

with a secure front door and an electronic surveillance system.[1]
Video clips and still photographs from that surveillance system
corroborate Fatico's testimony as to the comings and goings of
all three accomplices in the building.  Those video clips show
that Fatico, Wilson, and the victim, entered the building at
12:03 a.m. and walked upstairs toward the victim's second-floor
apartment.

Inside the victim's apartment, Fatico, Wilson, and the
victim smoked marijuana.  As corroborated by cell phone records,
Fatico maintained phone contact with defendant while she was with
the victim.  Fatico and Wilson left the victim's apartment to
meet up with defendant.  After the two accomplices told defendant
that the victim had jars of marijuana in his apartment, the
threesome moved to the next stage of the plan to rob the victim.
Fatico sent a text to the victim, informing him that she and
Wilson would be returning to his apartment, which they did.
Video clips show that the victim let Fatico and Wilson back into
the building at 1:37 a.m.

Approximately 15 minutes later, Fatico left the
victim's apartment, went downstairs, and let defendant, who is
depicted on video wearing a white t-shirt draped over his head to

---

[1] The external door of the victim's apartment building was
unlocked.  That door only allowed entry into a vestibule where a
second, locked front door had to be accessed to gain entry into
the building.

shield his face from the surveillance cameras, into the building.[2]
Surveillance footage also shows defendant, with the white t-shirt
still draped over his head, on the second floor of the apartment
building in the area of the victim's apartment.  Defendant
appears to be wearing gloves.  Fatico, who had since exited the
building with defendant's keys, waited in defendant's van.
Minutes later, Wilson left the building and joined her.
Defendant phoned Fatico approximately 13 minutes later, asking to
be picked up.  After exiting the victim's apartment, defendant is
captured on surveillance footage, covering his face with a jacket
and carrying a white garbage bag, in the second-floor hallway as
well as leaving the building.

When defendant returned to the car, he was carrying the
white garbage bag.  The trio drove to Fatico's house where
defendant revealed that the white bag contained jars of
marijuana, which Fatico recognized as being from the victim's
apartment.  Defendant claimed that the victim told him to "just
take it and go."  The victim's body was discovered in the
apartment two days later, when a family member, unable to make
contact with the victim, notified the apartment building's
maintenance supervisor.

---

[2] Surveillance footage shows defendant, clad in the white t-
shirt, entering the vestibule of the building and unsuccessfully
attempting to open the second, locked door, before using his cell
phone to text Fatico and inform her that the door was locked,
preventing his entry.

Defendant was indicted for two counts of murder in the second degree (felony murder) (Penal Law § 125.25 [3]), and one count each of burglary in the first degree (Penal Law § 140.30 [2]) and robbery in the first degree (Penal Law § 160.15 [1]).

At trial, the Chief Medical Examiner of the Erie County Medical Examiner's Office, who did not herself prepare the autopsy report, testified with respect to the autopsy findings as to the victim's injuries and cause of death. The autopsy revealed that the victim's physical injuries included: lacerations to the upper lip, right temple, and nose; fractures of the lower jaw and nasal skeleton; and hemorrhage in the right eye -- all of which, according to the medical examiner, were consistent with blunt force injury. The victim also suffered from the natural diseases of obesity and hypertensive cardiovascular disease, or more specifically, enlargement of the heart. Based on the autopsy findings, the medical examiner testified that the cause of death was "Hypertensive Cardiovascular Disease," with the contributing factor of obesity. The manner of death, however, was listed on the autopsy report as "[u]ndetermined." The medical examiner further testified that "[s]tress of any kind can hasten a person's demise by cardiovascular disease" and, while the victim's physical injuries themselves did not cause his death, "the stress that they caused[,] . . . given [the victim's] underlying heart disease[,] led to his death." The medical examiner opined that "but for a

violent struggle," the victim would not have died at the time that he did.  She explained that the manner of death was classified on the report as "[u]ndetermined" based on the inability to discern, on the facts known, between other manners of death, including natural and homicide.  The medical examiner testified that it was her opinion that the evidence pointed towards a nonnatural manner of death but that the ultimate conclusion was for the trier of fact.

The jury convicted defendant as charged.  The Appellate Division unanimously modified, on the law, by reversing defendant's convictions for murder in the second degree and dismissing those counts of the indictment (126 AD3d 1516 [4th Dept 2015]).  The Court held "that the People failed to prove beyond a reasonable doubt that it was reasonably foreseeable that defendant's actions, i.e., unlawfully entering the victim's apartment and assaulting him, would cause the victim's death" (id. at 1517).  The Court opined that, despite the medical examiner's testimony that defendant caused the victim's death, she "did not testify that defendant's culpable act was a direct cause of the death or that the fatal result was reasonably foreseeable," and, thus, the evidence was legally insufficient (id.).  The judgment was otherwise affirmed, with the Court determining that "[t]he accomplice's testimony was amply corroborated by, inter alia, a surveillance video from a camera inside the victim's apartment building and telephone records

showing numerous cell phone calls between defendant and the accomplice shortly before and immediately after the crimes were committed" (id. at 1517-1518).  Finally, the Court concluded that defendant's remaining contentions were without merit.

A Judge of this Court granted both the People and defendant leave to appeal (26 NY3d 966 [2015]).

II.

The primary issue in this appeal is whether legally sufficient evidence supported defendant's felony murder convictions.  We therefore view "the facts in a light most favorable to the People" to determine whether "'there is a valid line of reasoning and permissible inferences from which a rational jury could have found the elements of the crime proved beyond a reasonable doubt'" (People v Danielson, 9 NY3d 342, 349 [2007] [citations omitted]).

We agree with the People that the evidence at trial was sufficient to support defendant's convictions.

A.

With respect to felony murder in the second degree, the People were required to prove that, in the course of committing robbery and burglary, defendant caused the death of the victim (see Penal Law § 125.25 [3]), i.e., that defendant's conduct was "a sufficiently direct cause" of the victim's death (see People v Matos, 83 NY2d 509, 511 [1994]).  Sufficiently direct causation is established by proof of the following:  (1) that defendant's

actions were "an actual contributory cause of the death, in the sense that they 'forged a link in the chain of causes which actually brought about the death'" (Matter of Anthony M., 63 NY2d 270, 280 [1984], quoting People v Stewart, 40 NY2d 692, 697 [1976]); and (2) that "the fatal result was reasonably foreseeable" (People v Hernandez, 82 NY2d 309, 314 [1993]). Here, the jury was properly instructed on the law as to the two-pronged standard to establish causation.

With respect to defendant's actions being "an actual contributory cause of the death," we have explained that so long as "the necessary causative link is established, other causes, such as a victim's preexisting condition, will not relieve the defendant of responsibility for homicide" (see Anthony M., 63 NY2d at 280). In Matter of Anthony M., the defendant grabbed the handbag of an elderly victim with a history of heart-related illness, causing the victim to fall to the ground (see id. at 276). The victim was hospitalized with a fractured hip and other injuries; she died of a myocardial infarction approximately 10 days later (see id.). An expert medical witness opined that the cause of death was the stress of the mugging, in combination with the hip fracture and subsequent surgery, which "'precipitated the myocardial infarction with subsequent cardiac arrest and ultimate death'" (id. at 277).

In the companion case People v Cable, two defendants robbed an 89-year-old victim and his wife in their Manhattan

apartment (see id.).  The victim died of a myocardial infarction
two days later (see id. at 278).  At trial, the experts disagreed
as to when the myocardial infarction occurred, but one medical
examiner opined that "the emotional and physical trauma of the
burglary caused [the victim's] heart attack" (id. at 279).  With
respect to both cases, we held that the jury was entitled to
accept the expert testimony and find that causation had been
established, noting that "the testimony of the medical expert[s]
that there was a causal link [was not] so baseless or riddled
with contradiction that it was unworthy of belief as a matter of
law" (see id. at 281; see People v Ingram, 67 NY2d 897, 899
[1986] [concluding that medical expert's testimony that the
victim "died of a myocardial infarction precipitated by the
stress of finding a burglar in his home . . . was sufficient
under applicable legal standards"]).

Here, the medical examiner's testimony, in conjunction
with the crime scene evidence, established a sufficient causal
connection between defendant's infliction of blunt force trauma
injuries during the violent home invasion and the victim's death.
Specifically, the medical examiner testified that "[s]tress of
any kind can hasten a person's demise by cardiovascular disease"
and that, here, the stress caused by the injuries inflicted by
defendant, "given [the victim's] underlying heart disease[,] led
to his death."  That testimony, along with the crime scene
evidence that defendant's beating of the victim was severe and

immediate in its consequences, "was sufficient to prove that
defendant's conduct 'set in motion and legally caused the death'
of" the victim (People v DaCosta, 6 NY3d 181, 185 [2006], quoting
Matos, 83 NY2d at 511).  Thus, the jury could have reasonably
concluded that defendant's conduct was an actual contributory
cause of the victim's death.

        With respect to foreseeability of the death, the People
must prove "that the ultimate harm is something which should have
been foreseen as being reasonably related to the acts of the
accused" (People v Kibbe, 35 NY2d 407, 412 [1974], citing 1
Wharton, Criminal Law Procedure, § 169).  In this case, defendant
violently attacked the victim, in his home, breaking his jaw and
leaving him on the floor in a blood-spattered room where he was
found dead.  From all of the evidence and the circumstances
surrounding this violent encounter, the proof was sufficient to
permit the jury to conclude that the victim's heart failure,
induced by the extreme stress and trauma of such a violent
assault, was a directly foreseeable consequence of defendant's
conduct (see Matos, 83 NY2d at 511-512).

        Defendant's argument to the contrary disregards the
controlling law and blurs the distinction between the "cause of
death" and "manner of death."  As the medical examiner testified,
the cause of death, based on the autopsy of the body, was
"Hypertensive Cardiovascular Disease," but the manner of death,
derived from the facts and circumstances surrounding the death,

was listed on the report as "[u]ndetermined."[3]  The jury must consider the evidence of the facts and circumstances of the victim's death in determining causation and is not bound by an "undetermined" classification in a report that is not informed by the witnesses' trial testimony and corroborative evidence.  We conclude that the trial evidence adduced as to the manner of death created a question of fact for the jury regarding foreseeability, particularly given the violence of the encounter. Viewed in a light most favorable to the People, the evidence on causation was sufficient to support defendant's felony murder convictions.

                              B.

        Defendant also argues that the evidence was insufficient to support his convictions for burglary in the first degree and robbery in the first degree because the only evidence to support those convictions was Fatico's accomplice testimony. Pursuant to CPL 60.22 (1), "[a] defendant may not be convicted of any offense upon the testimony of an accomplice unsupported by

---

        [3] Notably, both the County Law and the New York City Charter provide medical examiners with the authority to conduct additional investigation or examination "to determine the means or manner of death" (County Law § 674 [3] [a]; see NY City Charter § 557 [f] [3]).  To the extent such additional investigation was ever conducted by the medical examiner in this case, the facts derived therefrom would not supplant the admissible evidence at trial as to the facts and circumstances surrounding the victim's death.  The jury, of course, must find the reasonable foreseeability of the death on that trial evidence alone.

corroborative evidence tending to connect the defendant with the commission of such offense."  However,

> "'[t]he corroborative evidence need not show the commission of the crime; it need not show that defendant was connected with the commission of the crime.  It is enough if it tends to connect the defendant with the commission of the crime in such a way as may reasonably satisfy the jury that the accomplice is telling the truth'" (People v Reome, 15 NY3d 188, 191-192 [2010], quoting People v Dixon, 231 NY 111, 116 [1921]).

Here, the video clips depicting a man who physically resembled defendant and the detailed phone records of all three accomplices "'so harmonize[d] with the accomplice's narrative as to have a tendency to furnish the necessary connection between defendant and the crime'" (id. at 194, quoting Dixon, 231 NY at 116-117).

Defendant's remaining contentions regarding the sufficiency of the evidence to support his convictions are without merit.

III.

Finally, defendant argues that the trial court erred in denying his motion to preclude further use of the DVD of video clips culled from the building's surveillance system at trial. The authenticating witness, who maintained the surveillance system, testified that during the computerized process of compressing and archiving the digital video files, certain images may overlap.  However, he further testified that the process, which he personally conducted, does not conjure up persons that were not originally present in the camera shot.  As such, the

trial court did not abuse its discretion in concluding that the image-overlap issue went to weight, but not admissibility, of the video evidence (see People v Patterson, 93 NY2d 80, 84 [1999]).

Accordingly, the order of the Appellate Division should be modified in accordance with this opinion, the case remitted to that Court for consideration of the facts, and, as so modified, affirmed.

People v Davis

No. 169

RIVERA, J.(dissenting in part):

Defendant was convicted for the death of a 41-year-old, well-developed male who was 6'1", weighed 270 pounds, and suffered from hypertensive cardiovascular disease, on the theory that the injuries suffered during a struggle with the defendant precipitated the victim's death from heart disease. To establish defendant's guilt for second degree felony murder, the People had to prove beyond a reasonable doubt that in the course of committing a robbery and burglary defendant caused the victim's death (Penal Law § 125.25 [3]). Causation for criminal liability requires both that the "culpable act was a 'sufficiently direct cause' of the death" and that the "fatal result was reasonably foreseeable" (People v Hernandez, 82 NY2d 309, 313-14 [1993], quoting Matter of Anthony M., 63 NY2d 270, 280 [1984]). I disagree with the majority that the People carried their burden to establish that the death was a foreseeable consequence of defendant's actions.

According to the trial evidence, during a struggle with defendant, the victim suffered a broken jaw and nose, as well as several lacerations to his face. Though there was a significant

- 1 -

loss of blood, the victim did not suffer any internal trauma to his head, neck, or torso, and the medical examiner who conducted the autopsy characterized the injuries, either individually or combined, as "not significant enough to cause or contribute to death."  The cause of death was identified as hypertensive cardiovascular disease, of which obesity was a contributing factor.  The People submitted testimony from a medical examiner who did not conduct the autopsy, who opined that the injuries did not cause the victim's death but that the stress associated with the injuries "given [the victim's] underlying heart disease led to his death."  In other words, the struggle-induced stress combined with defendant's obesity and preexisting heart condition led to the victim's death.

Prior cases in which the Court determined that a victim's death was foreseeable involved a defendant's direct causatory action that put the victim at obvious risk of death -- conduct not present in defendant's case.  For example, in Hernandez, an armed defendant confronted a team of officers as he tried to escape a failed robbery (82 NY2d at 312).  When he refused to surrender and moved towards the officers, gun drawn, they opened fire and one officer was fatally shot in the head (id.).  Remarking on the codefendant's culpability for the officer's death, the Court stated that "it [was] simply implausible for defendants to claim that defendants could not have foreseen a bullet going astray when [the defendant] provoked

a gun battle outside a residential building in an urban area"
(id. at 319). In People v Matos (83 NY2d 509, 511 [1994]), a
police officer suffered fatal injuries after being trapped in a
rooftop airshaft while chasing the defendant as he tried to
escape capture from the scene of an attempted armed robbery. The
Court held it was "foreseeable that someone might fall while in
hot pursuit across urban roofs in the middle of the night" (id.
at 512). Also, in a case ostensibly about superceding events,
the Court concluded in People v Kibbe (35 NY2d 407, 413 [1974])
that defendants were liable for the victim's death. As the Court
detailed, the defendants had robbed the victim and threw him out
of a car onto the shoulder of a rural highway, leaving him alone
at night in near-zero degree weather with limited visibility
conditions, without his glasses, and with his pants down,
shoeless and his shirt rolled up around his chest (id. at 410-
11). Shortly after abandoning him on the road, the victim was
struck and killed by a truck (id.). The Court held the
defendants were liable for these "directly foreseeable
consequences of their actions" (id. at 413).

In these cases, viewing the facts in context, an
obvious result of defendants' criminal behavior was to place the
victims at risk of death. In Hernandez, it was foreseeable that
defendant's act of confronting the officers with a loaded weapon
would lead to a gun fight, and in no way surprising that someone
might be killed in the cross fire. In Matos, it was foreseeable

that the officer would die during a nighttime rooftop chase initiated by defendant's attempted escape. Certainly, in <u>Kibbe</u>, the victim's death was reasonably foreseeable when defendants abandoned him at night on a highway in a physically vulnerable state.[*]

Here, however, it is not foreseeable that a 41-year-old who appears overweight but was sufficiently able to engage his attacker would die as a result of the struggle where the injuries from the assault were a broken jaw and nose, lacerations and bruises. The autopsy report states that these injuries themselves are not the type that would cause or contribute to death. Accordingly, without the required foreseeability, defendant's felony conviction should not stand.

For the reasons I have discussed, and because I agree that defendant's other claims are without merit, I would affirm the Appellate Division in its entirety.

---

[*]The Court has previously addressed causation in the felony murder context of heart attacks in <u>Anthony M.</u> (63 NY2d at 281), but that case is not dispositive here. The Court in <u>Anthony M.</u> focused exclusively on whether the defendants' actions were a contributing factor to the heart attack deaths such that the acts were a sufficiently direct cause of death (<u>id.</u>; <u>see</u> <u>also</u> <u>Hernandez</u>,82 NY2d at 314). The Court did not address foreseeability. Regardless, <u>Anthony M.</u> and its companion case are distinguishable because they involved elderly victims, ages 83 and 89 respectively, who died of heart attacks after defendants' assaults (<u>id.</u> at 276-77). The facts there are not comparable to a physical struggle wherein a 41-year-old victim suffers a broken jaw and nose, and dies of heart disease.

*   *   *   *   *   *   *   *   *   *   *   *   *   *   *   *   *   *

Order modified in accordance with the opinion herein, case remitted to the Appellate Division, Fourth Department, for consideration of the facts and, as so modified, affirmed. Opinion by Chief Judge DiFiore. Judges Pigott, Abdus-Salaam, Stein, Fahey and Garcia concur. Judge Rivera dissents in part in an opinion.

Decided November 21, 2016