OPINION OF THE COURT
Kaye, J.
 In the two appeals before us, elderly victims of crime — an attempted purse-snatching, and a robbery and burglary — some days after these incidents, succumbed to heart attacks, having shown no immediate signs of heart trouble. The central issue is whether there was sufficient proof to support the fact-finders’ determinations that the *276 stress of the incidents was a cause of the fatalities. Concluding that there was sufficient evidence of causal connection, we affirm the adjudication of Anthony M. for juvenile delinquency based on manslaughter, and we reverse the Appellate Division order and reinstate the conviction and sentence of defendant Frank Cable for felony murder, manslaughter and robbery. While our conclusion as to causal connection applies with equal force to Cable’s codefendant, Denise Godbee, she is entitled to a new trial with respect to the homicide charges because in her case the court erroneously refused to charge the affirmative defense to felony murder.
MATTER OF ANTHONY M.
Anthony M., a 12 year old, in the early evening of April 17, 1982, was seen loitering near a subway entrance in midtown Manhattan half an hour before the incident and again observed there, for about five minutes, when two elderly women passed, one of them the 83-year-old victim, Lee Gibson. In a matter of seconds, Anthony crouched behind her, grabbed her handbag and, when Mrs. Gibson would not release the bag, he pulled the strap with such force that she was whirled around, thrown to the sidewalk on her left side, and dragged a short distance, whereupon Anthony let go and disappeared into the subway station. Mrs. Gibson was taken to the hospital, where a fractured left hip and other bruises were diagnosed. She was also that day examined by her cardiologist, Dr. Jerome Zacks, who recommended transfer to another hospital for surgery involving the implantation of a pin in order that she might walk again. In the initial days following the incident, she exhibited no symptoms of heart trouble, despite a medical history that included hypertension, long-standing angina (both believed to be under control), an enlarged heart, arteriosclerosis of the coronary artery and vascular disease. After hip surgery was performed, on April 19, in the second hospital, her condition progressed normally.
On April 25, Mrs. Gibson developed congestive heart failure, and two days later died of a myocardial infarction.
At a fact-finding hearing on charges against Anthony involving manslaughter, attempted robbery and assault, three medical experts testified regarding the cause of Mrs. *277 Gibson’s death. The testimony of Dr. Manuel Navarro, Associate Medical Examiner, who had performed the autopsy on April 28,1982, established that the direct cause of Mrs. Gibson’s death was a myocardial infarction, three to five days old. However, he could not with any medical certainty pinpoint the April 17 incident as a cause of the heart attack, nor could the medical witness called by the defense, Dr. Tina Dobsevage, an expert in internal medicine. Both felt;, in substance, that given her general physical condition Mrs. Gibson could well have died at any time even without the stress of the attempted purse-snatching. Dr. Zacks, the cardiologist, while acknowledging that he would not have recommended the hospital transfer and surgery if he perceived an undue risk, and that Mrs. Gibson was doing well postoperatively, expressed the opinion with a reasonable degree of medical certainty that the indirect cause of her death was the “stress of a mugging and subsequent fracture of a hip, surgery for that hip fracture, thereafter, pain and anxiety and fear of never being able to walk again while she was in the hospital prior to her sudden — cardiac arrest * * * [T]he stress precipitated the myocardial infarction with subsequent cardiac arrest and ultimate death.”
Finding that Anthony had created a substantial and unjustifiable risk when he selected Mrs. Gibson as his victim, that he was heedless of the peril created by his violence, and that his criminal act set in motion the sequence of events that led inexorably to her death, the trial court found that Anthony had committed acts that if done by an adult would constitute the crimes of attempted robbery in the first degree, assault in the first degree, and manslaughter in the second degree, and placed him with the Division for Youth, Title III, for 18 months. The Appellate Division affirmed, without opinion. Only the finding regarding manslaughter is challenged on appeal.
CABLE AND GODBEE
Arnold Weiner, an 89-year-old retired diamond merchant, and his wife, Anna, on July 23,1980 were robbed in their Manhattan apartment, threatened with a knife, bound, and left lying facedown on their living room floor. *278 Mr. Weiner was also struck in the face. Two days later, he died of a myocardial infarction.
A man identified as defendant Cable was seen entering the Weiners’ apartment building early in the morning of July 23. His girlfriend, defendant Godbee, who had recently begun work as a maid for the Weiners, followed moments later. Defendants rode up together in the elevator which stopped at the tenth floor, where the Weiners lived. Godbee was admitted to the Weiners’ apartment, but went right out to deliver a newspaper to a neighbor, leaving the apartment door unlocked, as she had done on a prior occasion. When she returned, she discovered that a male intruder (found by the jury to be Cable) had tied up Weiner, and was in the process of tying up Mrs. Weiner. Godbee, according to her statement to the police, started to call for help, but was threatened by the intruder, who proceeded to take several items of jewelry. Mrs. Weiner later awakened to find herself and her husband, both bound, on the living room floor, her husband bleeding from the mouth. She asked Godbee, who was seated in a chair, to call the superintendent, but Godbee said that she had already called the police. Some 20 minutes after he had entered, Cable was seen leaving the building, attempting to hide his face. Several of the items of jewelry were, later that day and the next, sold by Cable.
Weiner that afternoon was taken to Roosevelt Hospital by a neighbor, treated for the cuts and bruises, and returned home. The next day, July 24, he visited his personal physician, Dr. Walter Liebling, complaining of pains in his left lateral lower chest, just above the waistline; no EKG was taken. On July 25 he again complained of not feeling well and spent the day in bed. Late that day, some 56 or 57 hours after the theft, Weiner suffered heart failure and died.
At the trial of defendants for felony murder, depraved indifference murder, robbery and burglary, Dr. Liebling testified that, despite excess weight and arteriosclerosis, Weiner prior to July 23 was in “good general health.” During the four years of their relationship, Dr. Liebling had never detected any sign of heart disease in Weiner, and he had no serious illness.
*279 While the experts agreed that the direct cause of Weiner’s death was the myocardial infarction, they differed on when the infarction occurred. For the People, Dr. Elliott Gross, Chief Medical Examiner for New York City, who performed the autopsy, testified as a pathology expert that from the color of the infarct and lack of scar tissue, it most likely occurred 44 to 54 hours before death. In his opinion, it was possible for a 90-year-old man who had been burglarized to suffer a mild cardio-infarction that would not show up for two days, but the infarction also could have occurred without any excitement or trauma. Testifying in Godbee’s behalf, Dr. Steven Factor, a specialist in cardiovascular pathology, dated the infarct at 72 to 96 hours before Mr. Weiner’s death — which would have placed it before the theft — basing his opinion on the number of white cells and the presence of fibroblasts, or “scavenger” cells, at the periphery of the infarct.[1] Like Dr. Gross, he testified that it was “possible” that the stress of the robbery led directly to the infarct, but he could not be certain of this, and he further opined that no one could be. Dr. Millard Hyland, Deputy Chief Medical Examiner for Manhattan and Staten Island, testifying on rebuttal as an expert in forensic pathology, from the white cells and absence of fibroblasts, as well as the red blood cells of the clot and the absence of scar tissue, placed the infarct between 36 and 72 hours before death. Moreover, while acknowledging the possibility of other causes, he expressed the opinion with a reasonable degree of medical certainty, as well as commonsense certainty, that the emotional and physical trauma of the burglary caused Weiner’s heart attack.
Defendants were convicted of felony murder, manslaughter in the second degree, robbery in the first and second degrees, and burglary in the second degree. The Appellate Division, two Justices dissenting, reversed the convictions for felony murder, manslaughter and robbery in the first degree, and dismissed the charges underlying them.
In both appeals, defendants urge — as the Appellate Division majority concluded in Cable and Godbee — that *280 the necessary causal connection between offense and myocardial infarction was insufficiently established. Measured by a standard of “whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt” (Jackson v Virginia, 443 US 307, 319; see, also, People u Contes, 60 NY2d 620, 621), we believe that there was sufficient evidence to support the finding of causation made at the trial level.
For criminal liability to attach, a defendant’s actions must have been an actual contributory cause of death, in the sense that they “forged a link in the chain of causes which actually brought about the death” (People v Stewart, 40 NY2d 692, 697). “An obscure or a merely probable connection between an assault and death will, as in every case of alleged crime, require acquittal of the charge of any degree of homicide” (People v Brengard, 265 NY 100, 108). A defendant’s acts need not be the sole cause of death; where the necessary causative link is established, other causes, such as a victim’s preexisting condition, will not relieve the defendant of responsibility for homicide (see People v Kane, 213 NY 260, 273). By the same token, death need.not follow on the heels of injury. Even an intervening, independent agency will not exonerate defendant unless “the,death is solely attributable to the secondary agency, and not at all induced by the primary one” (People v Kane, 213 NY 260, 270, supra). An injury may trigger immediate measurable deterioration and a gradual process of dying for which defendant is responsible (People v Brengard, 265 NY 100, 104-105, supra; see, also, People v Roberts, 73 AD2d 954), but that is not to say that a victim who evidences no immediate decline cannot just as surely have been set by defendant’s acts on a certain course to death.
Though sometimes perceptible to lay witnesses (see People v Brengard, 265 NY 100, 105, supra), the progression from injury to death, often unseen and not readily comprehended, will generally be a subject for expert medical opinion. To establish a causal connection, conclusions which are only “contingent, speculative, or merely possible” (Matter of Burris v Lewis, 2 NY2d 323, 327) will not suffice, but neither is absolute certainty and the exclusion *281 of every other possibility required. While in both cases other possible causes of the heart attacks suffered by the elderly victims were not eliminated, the medical evidence, viewed from the perspective enunciated in Jackson, supported the fact-finders’ determinations that defendants’ acts were at least a contributing cause of both fatalities. In Anthony M., the medical evidence connected the stress of the fall and fractured hip to the consequent stresses and fears of immobility, pain and surgery to correct the condition caused by the fall, leading to cardiac arrest and ultimate death. Similarly, in Cable and Godbee, there was proof in the medical evidence to support the jury determination that the stress arising from defendants’ acts was a cause of the infarction that manifested itself two days later. In neither instance was the testimony of the medical expert that there was a causal link so baseless or riddled with contradiction that it was unworthy of belief as a matter of law (see People v Stewart, 40 NY2d 692, 699, supra; People v Ledwon, 153 NY 10) and, despite contrary medical opinion, the jury was entitled to accept this evidence.
Godbee and Anthony M. raise several additional issues with respect to sufficiency of the evidence and fairness of the trials.
Anthony M. argues that, regardless of causation, there was insufficient proof that he possessed the necessary mental state for manslaughter. We disagree. Viewed in the light most favorable to the prosecution, there was sufficient proof in the circumstances of the incident for the fact-finder to conclude that Anthony was aware of and consciously disregarded a substantial and unjustifiable risk that death would result from his actions. (See People v Heinsohn, 61 NY2d 855; Penal Law, § 125.15, subd 1.) The evidence shows that Anthony made a careful, conscious choice when, after a period of watching and waiting in front of the subway station, he marked as his intended victim a greyhaired, five-foot, two-inch, elderly woman, obviously selected from the passing crowd because of her condition, as the easiest prey. We must agree with the courts below that having sought out such a victim, Anthony is to be held responsible for the unusual peril he *282 created to her when he tugged at her purse strap with such force that she was whirled around and thrown to the ground, and then briefly dragged by him along the pavement.
As to Godbee’s contention that the evidence at most showed her “guilty knowledge and negative acquiescence,” and thus was legally insufficient to convict her, as an accessory, of robbery, burglary and felony murder, we agree with the Appellate Division that the evidence was sufficient to justify the jury’s conclusion that she was an accessory. Viewed in the light most favorable to the People (People v Malizia, 62 NY2d 755, 757; People v Kennedy, 47 NY2d 196, 203; People v Benzinger, 36 NY2d 29, 32), the evidence demonstrated that she intentionally aided Cable in the conduct constituting the offense (Penal Law, § 20.00): Godbee and Cable, her boyfriend, arrived in the building at approximately the same early morning hour and rode up in the elevator, which stopped at the Weiners’ floor; she left the Weiners’ door unlatched, and on finding an intruder in the apartment failed to alert the superintendent or doorman, who might have stopped an intruder leaving the building, but instead called the police, thus affording Cable an opportunity to escape; she gave the police a misleading description of Cable, and thereafter moved without leaving a forwarding address. That each act could, viewed separately, perhaps be subject to an innocent explanation does not at this juncture entitle Godbee to upset the jury’s finding that she intentionally aided Cable in the commission of robbery, burglary and felony murder.
Although the evidence against Godbee was sufficient, we agree, for the reasons stated by the Appellate Division, that the trial court erred in refusing to charge the affirmative defense to felony murder. We cannot disregard this error. The jury convicted Godbee of reckless manslaughter (as a lesser included offense of depraved indifference murder), thereby demonstrating its acceptance of the People’s contention that Godbee caused the victim’s death by soliciting, requesting, commanding, importuning or intentionally aiding Cable to engage in such conduct (Penal Law, § 20.00). This verdict would have been unreconcilable with acquittal of felony murder based on the affirmative defense *283 because, to establish the affirmative defense, Godbee had to prove that she did not solicit, request, command, importune, cause or aid the commission. of the homicide act (Penal Law, § 125.25, subd 3, par [a]). Nevertheless, as a practical matter, by erroneously refusing to give the charge the court divested Godbee’s counsel of any reason to argue that, while she may have aided in the robbery, Godbee did not participate in the acts causing the victim’s death. Success on this issue, absent submission of the affirmative defense to which Godbee was entitled, would have been an empty victory since she would still have been convicted of felony murder. Consequently, an acquittal on depraved indifference murder or its lesser included offenses could not have benefited Godbee in terms of the sentence imposed. Had counsel been given the opportunity to argue the affirmative defense, as he should have been, we cannot say the jury would have reached the conclusion it did regarding Godbee’s complicity in the acts causing the victim’s death. Although this error would on the law entitle Godbee to a new trial on the felony murder count, since the Appellate Division has not yet passed on the facts the order for a new trial must await that court’s review of the facts. Furthermore, since the jury’s acceptance of the affirmative defense to felony murder would have required an acquittal of reckless manslaughter, the erroneous failure to give the instruction would on the law require a new trial on that charge as well.
Finally, Godbee contends that it was reversible error for the trial court to have denied her request for an adjournment, made both during and at the conclusion of Dr. Hyland’s testimony, so that she could “be in a position to secure” another expert witness in surrebuttal. The court rejected the request, on the basis that it came at “the nth hour” after “ample opportunity” and that such testimony would be purely cumulative, each side having already produced two medical expert witnesses on the issue of causation. The granting of an adjournment for any purpose is a matter resting within the sound discretion of the trial court (People v Singleton, 41 NY2d 402, 405; People v Oskroba, 305 NY 113, 117). Here, no surrebuttal witness was identified, the Trial Judge’s expressed concern that *284 the proposed medical testimony would be only cumulative was not addressed, and no showing was made that the proof would be material and favorable to the defense (see People v Singleton, 41 NY2d 402, 406, supra; and People v Foy, 32 NY2d 473, 478). On this record, we cannot say that the trial court abused its discretion as a matter of law by denying the adjournment, or by denying Godbee’s request to present another expert witness in surrebuttal.[2]
Accordingly, in Matter of Anthony M., the order of the Appellate Division should be affirmed. In People v Cable and Godbee, the orders of the Appellate Division, insofar as appealed from, should be reversed, the convictions and sentences for felony murder, second degree manslaughter and first degree robbery reinstated, and the case remitted to the Appellate Division, First Department, for consideration of the facts (CPL 470.25, subd 2, par [d]; 470.40, subd 2, par [b]). As to defendant Godbee, in view of the charge error described above, unless the Appellate Division on consideration of the facts dismisses the felony murder charge against her, that court is directed to reverse God-bee’s felony murder conviction and order a new trial on that count. As to Godbee’s manslaughter conviction, since manslaughter was submitted as a lesser included offense of depraved indifference murder, on which the jury acquitted, unless the Appellate Division dismisses her manslaughter conviction on its review of the facts, the court should vacate her second degree manslaughter conviction, without prejudice to an application by the People for leave to resubmit to a Grand Jury the facts upon which that conviction was based (see People v Mayo, 48 NY2d 245, 253).

. It was stipulated that Dr. Geeben Natarajan, Deputy Medical Examiner of New Jersey, would have given the same testimony as Dr. Factor, for defendant Cable.

. [4] Godbee’s contention in this court is not so much that the evidence was improper rebuttal, particularly since (a) it responded to the scientific observations given by the defense expert; (b) permitting testimony, even if not technically rebuttal, was not shown to have been an abuse of discretion (CPL 260.30, subd 7; see, also, People v Harris, 57 NY2d 335, 345-346, cert den 460.US 1047); and (c) no objection was asserted on the basis of improper rebuttal until the" witness had completed direct, cross and redirect examination, when a motion to strike was made (see Richardson, Evidence [Prince, 10th ed], § 537, p 529). Godbee’s contention — which we reject — is that since the prosecution was allowed rebuttal, the defense had an absolute right under CPL 260.30 (subd 7) to present surrebuttal testimony in the person of another medical witness.