OPINION OF THE COURT
Chief Judge DiFiore.
In this appeal, we conclude that there was legally sufficient evidence to support the jury’s findings that defendant’s assault of the victim during a home invasion was an actual contributory cause of the victim’s death and that the victim’s death, induced by the stress of the violent event, was a reasonably *297 foreseeable result of defendant’s conduct. We therefore modify the Appellate Division order and remit the case to the Appellate Division.
L
The victim was found dead on the floor of his second-floor apartment, lying amongst the remnants of his broken coffee table, two days after he was assaulted during a robbery-burglary of his home. Photographs of the scene depicted blood spatter in the living room and blood smeared on the couch, wholly consistent with a violent assault, as well as the victim’s body lying among the evidence of a violent encounter. Subsequent investigation revealed the involvement of defendant and his two accomplices, Teara Fatico and Chasity Wilson. Both Fatico and Wilson were indicted and pleaded guilty. Fatico, who pleaded guilty to attempted burglary, testified at trial as an accomplice as a matter of law. The evidence at trial was as follows.
On August 21, 2011, the victim sent Fatico a private Face-book message to which defendant, Fatico’s then boyfriend, responded on her behalf. In that message, defendant, acting as Fatico, informed the victim that she and Wilson would be coming over to his apartment. The three planned for Fatico and Wilson to go to the victim’s apartment and determine if it contained valuables and drugs to steal. That night, defendant drove Fatico and Wilson to the victim’s apartment complex, which was equipped with a secure front door and an electronic surveillance system.[1] Video clips and still photographs from that surveillance system corroborate Fatico’s testimony as to the comings and goings of all three accomplices in the building. Those video clips show that Fatico, Wilson, and the victim entered the building at 12:03 a.m. and walked upstairs toward the victim’s second-floor apartment.
Inside the victim’s apartment, Fatico, Wilson, and the victim smoked marijuana. As corroborated by cell phone records, Fatico maintained phone contact with defendant while she was with the victim. Fatico and Wilson left the victim’s apartment to meet up with defendant. After the two accomplices told defendant that the victim had jars of marijuana in his apartment, the threesome moved to the next stage of the plan to rob *298 the victim. Fatico sent a text to the victim, informing him that she and Wilson would be returning to his apartment, which they did. Video clips show that the victim let Fatico and Wilson back into the building at 1:37 a.m.
Approximately 15 minutes later, Fatico left the victim’s apartment, went downstairs, and let defendant, who is depicted on video wearing a white T-shirt draped over his head to shield his face from the surveillance cameras, into the building.[2] Surveillance footage also shows defendant, with the white T-shirt still draped over his head, on the second floor of the apartment building in the area of the victim’s apartment. Defendant appears to be wearing gloves. Fatico, who had since exited, the building with defendant’s keys, waited in defendant’s van. Minutes later, Wilson left the building and joined her. Defendant phoned Fatico approximately 13 minutes later, asking to be picked up. After exiting the victim’s apartment, defendant is captured on surveillance footage, covering his face with a jacket and carrying a white garbage bag, in the second-floor hallway as well as leaving the building.
When defendant returned to the car, he was carrying the white garbage bag. The trio drove to Fatico’s house where defendant revealed that the white bag contained jars of marijuana, which Fatico recognized as being from the victim’s apartment. Defendant claimed that the victim told him to “just take it and go.” The victim’s body was discovered in the apartment two days later, when a family member, unable to make contact with the victim, notified the apartment building’s maintenance supervisor.
Defendant was indicted for two counts of murder in the second degree (felony murder) (Penal Law § 125.25 [3]), and one count each of burglary in the first degree (Penal Law § 140.30 [2]) and robbery in the first degree (Penal Law § 160.15 [1]).
At trial, the Chief Medical Examiner of the Erie County Medical Examiner’s Office, who did not herself prepare the autopsy report, testified with respect to the autopsy findings as to the victim’s injuries and cause of death. The autopsy revealed that the victim’s physical injuries included: lacera *299 tions to the upper lip, right temple, and nose; fractures of the lower jaw and nasal skeleton; and hemorrhage in the right eye—all of which, according to the Medical Examiner, were consistent with blunt force injury. The victim also suffered from the natural diseases of obesity and hypertensive cardiovascular disease, or more specifically, enlargement of the heart. Based on the autopsy findings, the Medical Examiner testified that the cause of death was “Hypertensive Cardiovascular Disease,” with the contributing factor of obesity. The manner of death, however, was listed on the autopsy report as “Undetermined.” The Medical Examiner further testified that “[s] tress of any kind can hasten a person’s demise by cardiovascular disease” and, while the victim’s physical injuries themselves did not cause his death, “the stress that they caused[,] . . . given [the victim’s] underlying heart disease [,] led to his death.” The Medical Examiner opined that “but for a violent struggle,” the victim would not have died at the time that he did. She explained that the manner of death was classified on the report as “[u]ndetermined” based on the inability to discern, on the facts known, between other manners of death, including natural and homicide. The Medical Examiner testified that it was her opinion that the evidence pointed towards a non-natural manner of death but that the ultimate conclusion was for the trier of fact.
The jury convicted defendant as charged. The Appellate Division unanimously modified, on the law, by reversing defendant’s convictions for murder in the second degree and dismissing those counts of the indictment (126 AD3d 1516 [4th Dept 2015]). The Court held “that the People failed to prove beyond a reasonable doubt that it was reasonably foreseeable that defendant’s actions, i.e., unlawfully entering the victim’s apartment and assaulting him, would cause the victim’s death” (id. at 1517). The Court opined that, despite the Medical Examiner’s testimony that defendant caused the victim’s death, she “did not testify that defendant’s culpable act was a direct cause of the death or that the fatal result was reasonably foreseeable,” and, thus, the evidence was legally insufficient (id.). The judgment was otherwise affirmed, with the Court determining that “[t]he accomplice’s testimony was amply corroborated by, inter alia, a surveillance video from a camera inside the victim’s apartment building and telephone records showing numerous cell phone calls between defendant and the accomplice shortly before and immediately after the crimes were *300 committed” (id. at 1517-1518). Finally, the Court concluded that defendant’s remaining contentions were without merit.
A Judge of this Court granted both the People and defendant leave to appeal (26 NY3d 966 [2015]).
h-H hH
The primary issue in this appeal is whether legally sufficient evidence supported defendant’s felony murder convictions. We therefore view “the facts in a light most favorable to the People” to determine whether “ ‘there is a valid line of reasoning and permissible inferences from which a rational jury could have found the elements of the crime proved beyond a reasonable doubt’ ” (People v Danielson, 9 NY3d 342, 349 [2007] [citations omitted]).
We agree with the People that the evidence at trial was sufficient to support defendant’s convictions.
A.
With respect to felony murder in the second degree, the People were required to prove that, in the course of committing robbery and burglary, defendant caused the death of the victim (see Penal Law § 125.25 [3]), i.e., that defendant’s conduct was “a sufficiently direct cause” of the victim’s death (see People v Matos, 83 NY2d 509, 511 [1994]). Sufficiently direct causation is established by proof of the following: (1) that defendant’s actions were “an actual contributory cause of [the] death, in the sense that they ‘forged a link in the chain of causes which actually brought about the death’ ” (Matter of Anthony M., 63 NY2d 270, 280 [1984], quoting People v Stewart, 40 NY2d 692, 697 [1976]); and (2) that “the fatal result was reasonably foreseeable” (People v Hernandez, 82 NY2d 309, 314 [1993]). Here, the jury was properly instructed on the law as to the two-pronged standard to establish causation.
With respect to defendant’s actions being “an actual contributory cause of [the] death,” we have explained that so long as “the necessary causative link is established, other causes, such as a victim’s preexisting condition, will not relieve the defendant of responsibility for homicide” (see Anthony M., 63 NY2d at 280). In Matter of Anthony M., the defendant grabbed the handbag of an elderly victim with a history of heart-related illness, causing the victim to fall to the ground (see id. at 276). The victim was hospitalized with a fractured hip and other injuries; she died of a myocardial infarction approximately 10 *301 days later (see id.). An expert medical witness opined that the cause of death was the stress of the mugging, in combination with the hip fracture and subsequent surgery, which “ ‘precipitated the myocardial infarction with subsequent cardiac arrest and ultimate death’ ” (id. at 277).
In the companion case People v Cable, two defendants robbed an 89-year-old victim and his wife in their Manhattan apartment (see id.). The victim died of a myocardial infarction two days later (see id. at 278). At trial, the experts disagreed as to when the myocardial infarction occurred, but one medical examiner opined that “the emotional and physical trauma of the burglary caused [the victim’s] heart attack” (id. at 279). With respect to both cases, we held that the jury was entitled to accept the expert testimony and find that causation had been established, noting that “the testimony of the medical expert [s] that there was a causal link [was not] so baseless or riddled with contradiction that it was unworthy of belief as a matter of law” (see id. at 281; see People v Ingram, 67 NY2d 897, 899 [1986] [concluding that medical expert’s testimony that the victim “died of (a) myocardial infarction precipitated by the stress of finding a burglar in his home . . . was sufficient under applicable legal standards”]).
Here, the Medical Examiner’s testimony, in conjunction with the crime scene evidence, established a sufficient causal connection between defendant’s infliction of blunt force trauma injuries during the violent home invasion and the victim’s death. Specifically, the Medical Examiner testified that “[s] tress of any kind can hasten a person’s demise by cardiovascular disease” and that, here, the stress caused by the injuries inflicted by defendant, “given [the victim’s] underlying heart disease!,] led to his death.” That testimony, along with the crime scene evidence that defendant’s beating of the victim was severe and immediate in its consequences, “was sufficient to prove that defendant’s conduct ‘set in motion and legally caused the death’ of” the victim (People v DaCosta, 6 NY3d 181, 185 [2006], quoting Matos, 83 NY2d at 511). Thus, the jury could have reasonably concluded that defendant’s conduct was an actual contributory cause of the victim’s death.
With respect to foreseeability of the death, the People must prove “that the ultimate harm is something which should have been foreseen as being reasonably related to the acts of the accused” (People v Kibbe, 35 NY2d 407, 412 [1974], citing 1 Wharton, Criminal Law Procedure § 169). In this case, defend *302 ant violently attacked the victim, in his home, breaking his jaw and leaving him on the floor in a blood-spattered room where he was found dead. From all of the evidence and the circumstances surrounding this violent encounter, the proof was sufficient to permit the jury to conclude that the victim’s heart failure, induced by the extreme stress and trauma of such a violent assault, was a directly foreseeable consequence of defendant’s conduct (see Matos, 83 NY2d at 511-512).
Defendant’s argument to the contrary disregards the controlling law and blurs the distinction between the “cause of death” and “manner of death.” As the Medical Examiner testified, the cause of death, based on the autopsy of the body, was “Hypertensive Cardiovascular Disease,” but the manner of death, derived from the facts and circumstances surrounding the death, was listed on the report as “Undetermined.”[3] The jury must consider the evidence of the facts and circumstances of the victim’s death in determining causation and is not bound by an “undetermined” classification in a report that is not informed by the witnesses’ trial testimony and corroborative evidence. We conclude that the trial evidence adduced as to the manner of death created a question of fact for the jury regarding foreseeability, particularly given the violence of the encounter. Viewed in a light most favorable to the People, the' evidence on causation was sufficient to support defendant’s felony murder convictions.
B.
Defendant also argues that the evidence was insufficient to support his convictions for burglary in the first, degree and robbery in the first degree because the only evidence to support those convictions was Fatico’s accomplice testimony. Pursuant to CPL 60.22 (1), “[a] defendant may not be convicted of any offense upon the testimony of an accomplice unsupported by corroborative evidence tending to connect the defendant with the commission of such offense.” However,
*303 “ ‘[t]he corroborative evidence need not show the commission of the crime; it need not show that defendant was connected with the commission of the crime. It is enough if it tends to connect the defendant with the commission of the crime in such a way as may reasonably satisfy the jury that the accomplice is telling the truth’ ” (People v Reome, 15 NY3d 188, 191-192 [2010], quoting People v Dixon, 231 NY 111, 116 [1921]).
Here, the video clips depicting a man who physically resembled defendant and the detailed phone records of all three accomplices “ ‘so harmonize[d] with the accomplice’s narrative as to have a tendency to furnish the necessary connection between defendant and the crime’ ” (id. at 194, quoting Dixon, 231 NY at 116-117).
Defendant’s remaining contentions regarding the sufficiency of the evidence to support his convictions are without merit.
HH HH )—I
Finally, defendant argues that the trial court erred in denying his motion to preclude further use of the DVD of video clips culled from the building’s surveillance system at trial. The authenticating witness, who maintained the surveillance system, testified that during the computerized process of compressing and archiving the digital video files, certain images may overlap. However, he further testified that the process, which he personally conducted, does not conjure up persons that were not originally present in the camera shot. As such, the trial court did not abuse its discretion in concluding that the image-overlap issue went to weight, but not admissibility, of the video evidence (see People v Patterson, 93 NY2d 80, 84 [1999]).
Accordingly, the order of the Appellate Division should be modified in accordance with this opinion, the case remitted to that Court for consideration of the facts, and, as so modified, affirmed.

. The external door of the victim’s apartment building was unlocked. That door only allowed entry into a vestibule where a second, locked front door had to be accessed to gain entry into the building.

. Surveillance footage shows defendant, clad in the white T-shirt, entering the vestibule of the building and unsuccessfully attempting to open the second, locked door, before using his cell phone to text Fatico and inform her that the door was locked, preventing his entry.

. Notably, both the County Law and the New York City Charter provide medical examiners with the authority to conduct additional investigation or examination “to determine the means or manner of death” (County Law § 674 [3] [a]; see NY City Charter § 557 [f| [3]). To the extent such additional investigation was ever conducted by the Medical Examiner in this case, the facts derived therefrom would not supplant the admissible evidence at trial as to the facts and circumstances surrounding the victim’s death. The jury, of course, must find the reasonable foreseeability of the death on that trial evidence alone.