People v Lalonde (2018 NY Slip Op 02360)





People v Lalonde


2018 NY Slip Op 02360


Decided on April 5, 2018


Appellate Division, Third Department



Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.


This opinion is uncorrected and subject to revision before publication in the Official Reports.



Decided and Entered: April 5, 2018

106134

[*1]THE PEOPLE OF THE STATE OF NEW YORK, Respondent,
v
ANTHONY LALONDE, Appellant.

Calendar Date: February 16, 2018

Before: McCarthy, J.P., Egan Jr., Devine, Clark and Rumsey, JJ.


Rural Law Center of New York, Castleton (Cynthia Southard of counsel), for appellant, and appellant pro se.
Gary M. Pasqua, District Attorney, Canton (Lauren D. Konsul, New York State Prosecutors Training Institute, Albany, of counsel), for respondent.


Egan Jr., J.

MEMORANDUM AND ORDER
Appeals (1) from a judgment of the County Court of St. Lawrence County (Richards, J.), rendered July 8, 2013, upon a verdict convicting defendant of the crimes of robbery in the first degree and murder in the second degree, and (2) by permission, from an order of said court (Champagne, J.), entered November 21, 2016, which denied defendant's motion pursuant to CPL 440.10 to vacate the judgment of conviction, without a hearing.
On the evening of November 18, 2010, 83-year-old Russell Lawton (hereinafter the victim) and his 67-year-old roommate, Guy
Bartlett, were eating pizza in the kitchen of their shared second-floor apartment at 930 Ford Street in the City of Ogdensburg, St. Lawrence County, when three individuals wearing masks, dark clothes and gloves entered their residence and demanded that the victim turn over his money. While attempting to empty the victim's pockets, one of the intruders tipped over the chair in which the victim was sitting, knocking him to the floor. Bartlett then scuffled with one of the intruders while attempting to grab hold of a wooden "stick" that the intruders had brought with them and he was also knocked to the ground. Two of the intruders then picked Bartlett up, threw him on top of the victim and then left the apartment. Bartlett then checked the victim's pulse and, not finding one, called 911. The victim was subsequently administered CPR and thereafter brought to the hospital where he was pronounced dead a short time later.
In June 2012, defendant and two codefendants were charged by indictment with robbery in the first degree and murder in the second degree. Following a joint trial, defendant was convicted as charged; his two codefendants were acquitted. County Court (Richards, J.) thereafter sentenced defendant to an aggregate prison term of 22 years to life. Defendant's subsequent CPL article 440 motion seeking to vacate the judgment of conviction was denied without a hearing. Defendant now appeals from the judgment of conviction and, by permission, from the denial of his motion to vacate.
Defendant initially contends that his convictions for robbery in the first degree and murder in the second degree are against the weight of the evidence. As relevant here, "[a] person is guilty of robbery in the first degree when he [or she] forcibly steals property and when, in the course of the commission of the crime or of immediate flight therefrom, he or [she] . . . [c]auses serious physical injury to any person who is not a participant in the crime" (Penal Law § 160.15 [1]). A person is guilty of murder in the second degree based upon a felony murder theory "when he [or she] commits or attempts to commit robbery . . . and, in the course of and in furtherance of such crime or of immediate flight therefrom, he [or she] . . . causes the death of another person" (Penal Law § 125.25 [3]; see People v Davis, 28 NY3d 294, 300 [2016]; People v Chaplin, 134 AD3d 1148, 1151 [2015], lv denied 27 NY3d 1067 [2016]).
With respect to the robbery charge, contrary to defendant's contention, there was ample evidence presented at trial establishing defendant's presence at and participation in the subject robbery. The People presented evidence establishing that, on the day in question, three men entered the victim's apartment wearing black masks and gloves and forcibly stole, among other things, two wallets from the victim. The People elicited testimony from numerous witnesses that, earlier that same day, defendant participated in the planning of the robbery while at his brother's house and independently attempted to recruit two other individuals to participate in same. Victor Gardner, defendant's friend, testified that he was present with defendant at defendant's brother's house when the robbery was being planned. While there, Gardner observed defendant leave the house with Samantha Mashaw; defendant was carrying black Halloween masks, and both he and Mashaw left in Mashaw's vehicle. Gardner testified that, a short time later, defendant's brother became concerned that defendant had not yet returned so they went to look for him, whereupon Gardner observed Mashaw's vehicle parked along Denny Street, near an adjacent alley that led to the victim's apartment. Mashaw testified that, on the day in question, she drove defendant and two other individuals to a location along Denny Street and parked along the side of the street; all three individuals got out of the vehicle, ran around the side of a nearby building and disappeared, returning a few minutes later. Gardner testified that a short time after observing Mashaw's vehicle, defendant's brother received a telephone call, and they subsequently picked up defendant and two other individuals at a nearby residence. After dropping off the two other individuals, defendant, his brother and Gardner drove to the middle of Black Bridge on State Route 37 in Ogdensburg, whereupon defendant exited the vehicle and threw a hat, two wallets and one glove over the side of the bridge into the river below.
Detective Sergeant Robert Wescott testified that, during the subsequent investigation of the robbery, a black glove was discovered on a chair in the dining room of the victim's apartment. Bartlett testified that it was the intruder that was going through the victim's pockets who removed his glove and left it behind. Deputy Sheriff Andrew Ashley, a K-9 officer with the St. Lawrence County Sheriff's Office, testified that his K-9 dog used the glove to gain a scent and proceeded to track the scent down the stairwell of the victim's apartment and around the back of the apartment building to a location along Denny Street. Wescott testified that the following day he and another officer retraced the path that the K-9 dog had tracked the night before. Wescott indicated that, upon reaching Denny Street, they discovered a small wooden axe handle in a grassy area [*2]between the sidewalk and the street. A DNA test was subsequently performed on, among other things, the glove and the axe handle. The DNA test of the glove revealed a mixture profile of DNA on the inside thereof. The forensic scientist who performed the DNA test testified that defendant could not be excluded as a possible contributor to the DNA profile found in the glove [FN1]. She further opined that the probability of an individual being randomly included in the subject DNA mixture was approximately 1 in 51.23 million. The forensic scientist also indicated that she collected a hair from the handle of the axe. A subsequent DNA test revealed that the hair belonged to Bartlett.
Westcott also testified that he participated in two separate interviews of defendant. Although defendant initially denied ever having been inside the victim's apartment, he later offered several contradictory explanations for how his DNA might have been present therein [FN2]. Defendant also initially denied ever having planned a robbery at the victim's apartment; however, he later indicated that he had participated in planning the robbery the day prior to the incident and that he thereafter attempted to get a third party to commit same instead of himself. The People also elicited testimony from Shawn McGregor, an inmate, who indicated that he spoke with defendant about the robbery while defendant was incarcerated pending trial. McGregor testified that defendant admitted his participation in the robbery, including the fact that he was concerned that he had left a glove behind at the scene that might contain his DNA. Wescott, meanwhile, testified that no information regarding the glove or DNA was ever released to the public during the course of this investigation. Based on the foregoing, we find that the evidence established defendant's participation in the robbery (see People v Griffin, 122 AD3d 1068, 1069-1070 [2014], lv denied 25 NY3d 1164 [2015]; People v Dearmas, 48 AD3d 1226, 1228 [2008], lv denied 10 NY3d 839 [2008]).
We likewise find unavailing defendant's contention that the People failed to prove that the victim suffered a serious physical injury (see Penal Law § 160.15 [1]) or, relatedly, that the victim's death was not directly caused by the conduct of the three intruders during the course of the robbery (see Penal Law § 125.25 [3]). Serious physical injury is defined as a "physical injury which creates a substantial risk of death, or which causes death or serious and protracted disfigurement, protracted impairment of health or protracted loss or impairment of the function of any bodily organ" (Penal Law § 10.00 [10]). Further, in order for defendant to be found criminally liable for the victim's death based on a felony murder theory, "defendant's actions [*3]must have been an actual contributory cause of death, in the sense that [he] 'forged a link in the chain of causes which actually brought about the death'" (Matter of Anthony M., 63 NY2d 270, 280 [1984], quoting People v Stewart, 40 NY2d 692, 697 [1976]) and that the fatal result was reasonably foreseeable (see People v Davis, 28 NY3d at 300; People v Hernandez, 82 NY2d 309, 314 [1993]; see also People v Matos, 83 NY2d 509, 511 [1994]). Moreover, as long as the "necessary causative link is established, other causes, such as a victim's preexisting condition, will not relieve the defendant of responsibility for homicide" (Matter of Anthony M., 63 NY2d at 280; accord People v Davis, 28 NY3d at 300; see People v Snow, 79 AD3d 1252, 1253-1254 [2010], lv denied 16 NY3d 800 [2011]).
The evidence established that, after entering the victim's apartment and demanding that he turn over his money, one of the intruders flipped over the victim's chair, knocking him to the floor. Bartlett was also knocked out of his chair onto the floor, and two of the intruders thereafter threw him on top of the victim. Samuel Livingstone, a coroner's physician, testified that he performed an autopsy on the victim. Livingstone opined that the victim's death was the result of an internal hemorrhage caused by a ruptured aortic aneurysm that effectively caused the victim to bleed to death. Livingstone opined that, although the victim's aneurysm had been present for years, the victim's blood pressure was elevated as a result of the intruders' unexpected and unannounced entry into the apartment, and the aortic aneurysm ruptured due to the blunt force trauma that occurred when he fell to the ground and/or when his roommate was subsequently thrown on top of him. Livingstone opined that, upon the rupture of the aortic aneurysm, the victim would have become unresponsive within a matter of minutes.
Tara Moncrief testified that she arrived at the victim's apartment simultaneously as the three masked intruders were exiting same. When Moncrief entered the victim's apartment, she saw him on the floor and, upon observing that he had stopped breathing, attempted to perform CPR. Moncrief acknowledged that she was under the influence of muscle relaxers and did not know exactly how to perform CPR, but she testified unequivocally that she only performed two chest pumps on the victim's sternum by the time the paramedics arrived on scene. Defendant contends that Moncrief's performance of CPR on the victim was the sole cause attributable to the rupture of the victim's aortic aneurysm and, as a result, was an intervening cause that served to break the causative link between his and his codefendants' conduct. Defendant, however, offered no proof, medical or otherwise, to support such a theory (compare Matter of Anthony M., 63 NY2d at 280; People v Kane, 213 NY 260, 270 [1915]). Moreover, on cross-examination, Livingstone rejected defendant's theory, opining that chest compressions applied to the victim's mid-chest during CPR (i.e., Moncrief's attempt at CPR) would not have caused a corresponding increase in pressure on the victim's abdomen so as to cause the victim's aortic aneurysm to rupture. In fact, Livingstone opined that, had the aortic aneurysm not already ruptured, there would have been no need to administer CPR in the first instance, because the autopsy revealed that the victim had no other injuries that would have caused him to lose consciousness or otherwise caused his heart to stop beating. Livingstone's unchallenged medical opinion,[FN3] coupled with Bartlett's testimony as to the intruders' violent actions and the nearly immediate consequences thereof, culminating in the victim's death, established the requisite causative link between defendant's participation in the robbery and the victim's death (see People v Davis, 28 NY3d at 301; People v DaCosta, 6 NY3d 181, 185 [2006]).
With regard to foreseeability, given the stress induced by three intruders entering his [*4]apartment and forcibly stealing his property, the violent nature of the manner in which he was knocked to the floor and his roommate's body thrown on top of him, the evidence adduced at trial supports the jury's conclusion that the 83-year-old victim's death "was a directly foreseeable consequence of defendant's conduct" (People v Davis, 28 NY3d at 302; see People v Matos, 83 NY2d at 511-512). Accordingly, upon our review of the record, viewing the evidence in a neutral light and according due deference to the jury's credibility assessments, we are satisfied that defendant's convictions for robbery in the first degree and murder in the second degree are not against the weight of the evidence. Additionally, based on the seriousness of the offenses committed and given defendant's failure to take any responsibility for the fact that his criminal conduct led directly to the death of the victim, we find no abuse of discretion or extraordinary circumstances that would warrant a modification of defendant's sentence in the interest of justice (see People v Anthony, 152 AD3d 1048, 1054 [2017], lvs denied 30 NY3d 978, 981 [2017]; People v Burnell, 89 AD3d 1118, 1122 [2011], lv denied 18 NY3d 922 [2012]).
Turning to defendant's CPL article 440 motion, we reject defendant's contention that County Court (Champagne, J.) erred in denying his motion to vacate the judgment of conviction without a hearing based on, among other things, the People's alleged Brady violation in failing to disclose certain impeachment material with respect to a key witness at trial. A hearing on a CPL 440.10 motion is only required "where the defendant bases the motion upon nonrecord facts that are material and, if established, would entitle the defendant to relief" (People v Pabon, 157 AD3d 1057, 1058 [2018] [internal quotation marks and citation omitted]; see People v Satterfield, 66 NY2d 796, 799 [1985]; People v Mosley, 121 AD3d 1169, 1174 [2004], lv denied 24 NY3d 1086 [2014]). Defendant contends that, despite his pretrial requests for disclosure of Brady material, the People failed to disclose the full extent of their cooperation agreement with Gardner and later knowingly allowed Gardner to falsely testify about the extent thereof. Defendant argues that, had this claimed Brady violation not occurred and Gardner's testimony been properly discredited, the verdict may well have been different.
The People do have a duty to disclose evidence in their possession "which is exculpatory [in nature] or may be used for impeachment purposes" (People v Burroughs, 64 AD3d 894, 898 [2009], lv denied 13 NY3d 794 [2009]; see People v Fuentes, 12 NY3d 259, 263 [2009]; People v Steadman, 82 NY2d 1, 7 [1993]; see also Brady v Maryland, 373 US 83 [1963]), which includes the "existence of an agreement between the prosecution and a witness, made to induce the testimony of the witness" (People v Novoa, 70 NY2d 490, 496 [1987] [internal quotation marks and citation omitted]; see People v Lewis, 125 AD3d 1109, 1110 [2015]). "To establish a Brady violation, a defendant must show that (1) the evidence is favorable to the defendant because it is either exculpatory or impeaching in nature; (2) the evidence was suppressed by the prosecution; and (3) prejudice arose because the suppressed evidence was material" (People v Fuentes, 12 NY3d at 263; accord People v Lewis, 125 AD3d at 1110; see People v Garrett, 23 NY3d 878, 885 [2014]).
Here, the People did have a cooperation agreement with Gardner, but its existence was known to defendant well before trial. In August 2011, approximately 11 months after the murder, Gardner, who was then facing a number of unrelated criminal charges in several jurisdictions within St. Lawrence County and was represented by the Conflict Defender's Office, entered into a plea agreement in satisfaction of all pending charges, whereby he pleaded guilty to one count of burglary in the second degree with an agreed-upon prison term of nine years to be followed by five years of postrelease supervision. As part thereof, he also agreed to cooperate with the People with regard to this murder investigation. In 2012, when defendant was indicted on the instant charges, he was represented at arraignment by the Conflict Defender's Office — the same office that had earlier represented Gardner. Recognizing this and several other conflicts, [*5]the Conflict Defender's Office thereafter successfully moved to be relieved as defendant's counsel, specifically referencing, among other things, Gardner's cooperation agreement. Although the exact details of how and when defendant became aware of the existence of Gardner's cooperation agreement do not appear on the record, it is apparent that, by November 2012, defendant was aware of same based on his attorney's motion seeking to be relieved. Thus, contrary to defendant's assertion, the fact that Gardner was a cooperating witness for the People was known to defendant months before his 2013 trial and, therefore, such agreement was apparent on the face of the record (see People v Coleman, 155 AD3d 1097, 1098 [2017], lvs denied 30 NY3d 1114, 1119 [2018]) and could or should have been placed on the record during trial (see People v Culver, 69 AD3d 976, 979 [2010]). The documentary evidence that defendant relies upon in support of his claim that the People failed to disclose the full extent of their cooperation agreement with Gardner, therefore, does not constitute new evidence as contemplated by CPL 440.10.
The only nonrecord evidence that defendant proffered in support of his motion was a redacted supplemental report from Detective Sergeant Burns with respect to an interview that he conducted with Gardner in March 2011 [FN4]. This report, however, did not constitute newly discovered evidence (see CPL 440.10 [1] [g]) to the extent that it concerned facts that were already known to defendant at trial; namely, that Gardner was a cooperating witness for the People (see People v Cain, 96 AD3d 1072, 1073 [2012], lv denied 19 NY3d 1101 [2012])[FN5]. Accordingly, because defendant was aware of Gardner's cooperation agreement with the People, he was free to — and did in fact — cross-examine Gardner with respect to same. Defendant's failure to exercise due diligence by making a timely objection with respect to Gardner's testimony in this regard or the People's comments during summation render his arguments regarding defendant's alleged perjury and the People's alleged prosecutorial misconduct unpreserved for review (see People v Booker, 53 AD3d 697, 704 [2008], lvs denied 11 NY3d 853, 856 [2008]). Thus, defendant may not collaterally attack his conviction via a CPL article 440 motion based on facts that could have placed on the record during trial (see CPL 440.10 [2] [b]; People v Herbert, 147 AD3d 1208, 1210 [2017]; People v Jones, 101 AD3d 1482, 1483 [2012], lv denied 21 NY3d 1017 [2013]; People v Degondea, 3 AD3d 148, 157 [2003], lv denied 2 NY3d 798 [2004]).
In any event, even assuming, without deciding, that the People's failure to disclose Burns' redacted supplemental report or otherwise reveal the full extent of Gardner's plea/cooperation agreement with the People constituted a Brady violation (see generally People v Smith, 85 AD3d 1297, 1298 [2011]), under the circumstances presented, defendant failed to establish the materiality of this evidence. Notably, Gardner's testimony did not go wholly unimpeached — he was cross-examined regarding the fact that he had requested leniency from the People with regard to a friend's unrelated pending criminal charges in return for his testimony, and he was also questioned regarding his extensive criminal history [FN6]. Moreover, given the strength of the evidence against defendant and the independent proof separate and apart from Gardner's testimony establishing defendant's participation in the robbery, we find that there was no reasonable possibility that, had this impeachment material been timely disclosed, the jury would have reached a different verdict (see People v Miller, ___ AD3d ___, ___, 2018 NY Slip Op 01356, *1 [2018]; People v Johnson, 107 AD3d 1161, 1165-1166 [2013], lv denied 21 NY3d 1075 [2013]). Accordingly, we find no abuse of discretion in County Court's denial of defendant's CPL article 440 motion, without a hearing (see People v Pabon, 157 AD3d at 1058-1059; People v Kot, 126 AD3d at 1027; compare People v Giuca, 158 AD3d 642, 645-647 [2018]; People v Lewis, 125 AD3d at 1110-111). Defendant's remaining contentions, to the extent not specifically addressed, have been examined and found to be lacking in merit.
McCarthy, J.P., Devine, Clark and Rumsey, JJ., concur.
ORDERED that the judgment and order are affirmed.



Footnotes

Footnote 1: DNA samples from the victim, Bartlett and defendant's codefendants were also compared to the DNA profile found in the glove, and the forensic scientist testified that all of them were excluded as possible DNA contributors.

Footnote 2: Upon further questioning, defendant stated that he had been to defendant's apartment one week prior to November 18, 2010 to purchase prescription narcotics. Later during the same interview, defendant indicated that the victim lived next to a laundromat and perhaps the victim had picked up a pair of his boxer shorts or that maybe he had blown his nose and thrown it in the trash there. During a second interview with police, defendant was informed that his DNA was found at the crime scene. Although he initially denied this as a possibility, he later indicated that his DNA was on the victim because he had shaken hands with him earlier on the day that the victim was killed.

Footnote 3: No expert testimony was offered by defendant in order to refute Livingstone's findings as to the cause of death.

Footnote 4: Gardner was initially brought in for questioning with regard to his alleged involvement in an unrelated burglary. During the interview, however, Gardner revealed that he had information about the victim's murder. Ultimately, Gardner agreed to wear a wire in order to obtain statements from those individuals that he alleged were involved in the victim's murder. The report indicates that Burns informed Gardner during the interview that, if he did not follow through on his promise, Burns "was not going to see what [he] could do about the [b]urglary charge."

Footnote 5: Even if this report could be considered new evidence, it existed prior to trial and defendant failed to make any showing that it could not have been produced even with due diligence on his part (see CPL 440.10 [1] [g]; People v Kot, 126 AD3d 1022, 1026 [2015], lv denied 25 NY3d 1203 [2015]). Notably, defendant ultimately procured the subject report via a Freedom of Information Law request.

Footnote 6: Gardner acknowledged on cross-examination that, in return for his cooperation in the subject investigation, he asked the People if they could assist his friend — Joshua Pitts — in avoiding jail time in a pending criminal matter. Upon questioning, Gardner testified that the People indicated "that they would look into it, [but] that they couldn't guarantee anything."